*E-Filed 3/29/12 *

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

WILLIAM AMBROSIO, *et al.*,

Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S UNDER POLICY NO. B0146LDUSA0701030 *and* DOES 1-100, *inclusive*,

Defendants.

_____/

AND RELATED ACTIONS

_____/

No. C 11-04956 RS
No. C 11-04957 RS
No. C 11-04958 RS
No. C 11-05759 RS
No. C 11-05760 RS
No. C 11-05761 RS
No. C 11-06366 RS
No. C 11-06368 RS

**ORDER GRANTING MOTIONS TO DISMISS**

## I. INTRODUCTION

In these eight related actions, the common defendant, insurer Brit UW Limited ("Brit," sued as "Certain Underwriters at Lloyd's…"), moves to dismiss plaintiffs' claims for breach of contract and tortious breach of the covenant of good faith and fair dealing under Federal Rule of Civil Procedure 12(b)(6). Brit also moves, unopposed, to strike plaintiffs' requests for punitive damages in six of the eight cases. Subject to a few noted exceptions, the material facts and issues presented by Brit's motions are common to all plaintiffs. Accordingly, plaintiffs in all eight cases filed a joint opposition to the motions to dismiss, and Brit replied. After a hearing on the instant motions, in consideration of all the arguments raised by the parties, and for the reasons explained below, defendants' motions to dismiss must be granted, with leave to amend, in all eight cases.

## II. FACTUAL BACKGROUND

Plaintiffs are individual and institutional investors who purchased millions of dollars worth of debt securities from Asset Real Estate & Investment Co. (AREI), upon the recommendation of ePlanning Securities, Inc, the insured. These securities were corporate notes that conferred upon

plaintiffs tenancy-in-common (TIC) interests in various senior housing facilities managed by AREI. ePlanning allegedly misrepresented these as carefully-vetted, safe investments that met plaintiffs' precise investment objectives and risk tolerances when, in fact, they were highly speculative, illiquid assets offered in connection with a massive Ponzi scheme operated by ePlanning, AREI, and the two firms' principals.[1]  Among other things, plaintiffs accuse ePlanning of extensively misrepresenting the investment, its expected return, and AREI's background as an established and professional management firm.  In reality, according to the complaint, AREI's principal had a prior conviction for mail fraud and a history of promoting and managing similar, suspect real estate ventures. ePlanning also failed to tell plaintiffs of its own conflicts of interest arising out of its close relationship with AREI.  Within months, the loans securing the properties marketed to plaintiffs went into default.  Their investments, totaling many millions of dollars, were lost.

When plaintiffs discovered these facts, they brought claims against ePlanning in an arbitration filed before the Financial Industry Regulatory Authority (FINRA).  They also initiated a number of related actions before the California state courts alleging state securities laws violations, and other causes of action.[2]  ePlanning and its principal retained counsel pursuant to a securities broker/dealer professional liability insurance policy underwritten by Lloyd's, referred to as the Errors & Omissions Policy ("E&O policy").  At some point, ePlanning indicated an intention to settle plaintiffs' claims with the proceeds from that policy, but no settlement was ever offered. Instead, at a mandatory settlement conference held in the coordinated state court proceedings, counsel for Lloyd's informed plaintiffs' counsel that the coverage limit on the E&O policy had been exhausted.  Lloyd's then sent plaintiffs a coverage denial letter, taking the position that their claims were not covered by ePlanning's separate Directors, Officers and Company Liability Policy ("D&O policy").

---

[1] The alleged Ponzi scheme defrauded over 1000 victims of approximately $200 million.  ePlanning, AREI, and the associated individuals are now the subject of federal and state criminal proceedings.
[2] Brit moves, unopposed, for judicial notice of one of the complaints filed in plaintiffs' underlying state actions against ePlanning.  That complaint is a matter of public record, and neither party appears to dispute the allegations therein for purposes of these motions, therefore it is appropriately subject to judicial notice, and the motion is granted.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689-690 (9th Cir. 2001).

1  Thereafter, ePlanning's counsel withdrew and the firm filed for Chapter 11. With the
2 approval of the Bankruptcy Court, plaintiffs settled their claims against ePlanning for a stipulated
3 judgment in the amount of $2 million. In exchange for plaintiffs' covenant not to execute on its
4 assets, ePlanning assigned plaintiffs its potential claim against Brit, for its failure to defend or settle
5 plaintiff's claims under the D&O policy. Accordingly, in these eight related actions, plaintiffs
6 proceed on the theory that Brit was obligated to defend and settle the claims against ePlanning with
7 the proceeds of the D&O policy, but failed to do so.

The D&O policy[3] contains three insuring clauses:

> A. Underwriters shall pay on behalf of the Directors and Officers Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for an Individual Act.
> B. Underwriters shall pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any Claim first made against the Directors and Officers during the Policy Period for an Individual Act.
> C. Underwriters shall pay on behalf of the Company Loss resulting from any Claim first made against the Company during the Policy Period for a Corporate Act.

D&O policy, at 8. The policy goes on to define "Individual Act," as it is used within the first insuring clause as:

> … any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by any of the Directors and Officers, while acting in their capacity as … a director or officer of the Company … or an employee of the Company but only if the Claim is for an Employment Practice Violation or a Securities Law Violation.

---

[3] Brit moves, unopposed, for judicial notice of the D&O policy, attached as Ex. C to Fox Decl. (hereinafter "D&O policy") in *Wood River River Capital Resources, LLC, et al., v. Certain Underwriters at Lloyds Under Policy No. B0146LDUSA0701030*, No. 11-05759. Although the D&O policy has been attached to at least some of the complaints filed in this proceeding, to the extent it may not have been attached to all eight original pleadings, the Ninth Circuit has held: "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds). Because that holding describes present circumstances, the D&O policy is properly before the Court in all eight cases. That said, Brit has not established that judicial notice of the document is appropriate, as its contents cannot be "readily and accurately determined from sources whose accuracy cannot be questioned." Fed. R. Evid. 201.

*Id* at 7. A "Corporate Act" similarly means "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the Company involving a Securities Law Violation." *Id.* at 6. "Securities Law Violation" is defined broadly to encompass violations of federal and state laws. *Id.* at 7. Although Brit appears to dispute that plaintiffs have adequately plead conduct falling within the policy's affirmative grant of coverage, that issue is not squarely raised by the motion to dismiss.[4] Instead, the parties debate whether or not the policy's "Partial Professional Services Exclusion" excludes ePlanning's alleged conduct from coverage. That provision states:

> Underwriters shall not be liable to make any payment in connection with any Claim … for any act, error or omission in connection with the performance of any professional services by or on behalf of the Company for the benefit of any other entity or person.

*Id.* at 8.

All eight complaints advance claims for breach of contract, and tortious breach of the covenant of good faith and fair dealing, and seek to recover the amount of the stipulated judgment as well as other damages. Plaintiffs in *Anderson, et al. v. Certain Underwriters at Lloyd's, et al.*, No. 11-5760, additionally assert violations of California's Unfair Competition Law (UCL), California Business & Professions Section 17200, and a direct judgment creditor action as a third party beneficiary. Plaintiffs in *Nowacki v. Certain Underwriters at Lloyd's, et al.*, No. 11-6366, and *Oakdale Heights Redding et al. v. Certain Underwriters at Lloyd's, et al.*, No. 11-6368, assert bad faith, in addition to their claims for breach.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleadings are "so construed as to do substantial justice." Fed. R. Civ. P. 8(f). A complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) based on the "lack of a cognizable legal theory" or on "the absence

---

[4] Brit expressly reserves the right to contest this issue in its moving papers. (Reply Br. 1:17-18).

of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). When dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

## IV. DISCUSSION

A. Motion to Dismiss

Brit argues plaintiffs' claims are barred by the D&O policy's Partial Professional Services Exclusion. It disclaims any obligation to defend or settle claims arising out of ePlanning's sales of securities to third parties, such as those asserted by plaintiffs in the underlying FINRA arbitration and related actions. Plaintiffs disagree, arguing that the exclusion clause is ambiguous and must be interpreted accordingly, or else stricken, or at least reserved for interpretation later in litigation. In the event the Court interprets the exclusion to apply to the insured's sale of securities to third parties, plaintiffs insist their claims nonetheless survive because they have also alleged that ePlanning mismanaged the investments and misused investors' funds; activities they contend are not implicated by the Partial Professional Services Exclusion.

The parties agree that California law should be applied to interpret the D&O policy. Under California law, "[i]nsurance policies are contracts and therefore subject to the rules of construction governing contracts." *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 762-63 (2001) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). Questions of contract interpretation may be suitable for resolution as a matter of law on a motion to dismiss. *Valencia v. Smyth*, 185 Cal. App. 4th 153, 161-62 (2010). Insurance policies, like contracts in general, are construed to honor the "mutual intention" of the parties at the time the policy was issued, based "solely from the written provisions of the contract," *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003) (citing Cal. Civ. Code §§ 1636, 1639), and to give "effect to every part, if

reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Thus, under general principles of contract interpretation, if a given term is "clear and explicit," then its "ordinary and popular sense" governs, unless the parties intended some other special or technical meaning. *Mackinnon*, 31 Cal. 4th at 647-648; *Bank of the West*, 2 Cal. 4th at 1264.

On the other hand, a policy provision is ambiguous if, considered in context of the entire contract, it is amenable to two or more reasonable constructions. *Mackinnon*, 31 Cal. 4th at 648; *Safeco Ins. Co.*, 26 Cal. 4th at 763. In those circumstances, "California law instructs that such interpretive quandaries be resolved in favor of the insured and against the insurer." *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 765 (9th Cir. 2005). That is, the ambiguous policy term is to be "interpreted broadly" so as to "protect the insured's reasonable expectation of coverage in a situation…." *Id.* When determining the meaning of an ambiguous exclusionary clause, the California Supreme Court has instructed:

> We are not required … to select one "correct" interpretation from the variety of suggested readings … Instead, even assuming that the insurer's suggestions are reasonable interpretations which would bar recovery by the claimants, we must nonetheless … find [] … coverage so long as there is any other reasonable interpretation under which recovery would be permitted in the instant case."

*MacKinnon*, 31 Cal. 4th at 655 (quoting *State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 202-203 (1973)). The burden thus falls on the insurer to show that the exclusionary clause is "conspicuous, plain and clear," *id.* at 648 (citing *State Farm Mut. Auto Ins. Co.*, 10 Cal. 3d at 201-202), and that plaintiffs' claim "is specifically excluded." *Id.* (citing *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998)). On the other hand, interpretations of exclusions that render coverage illusory, null, or meaningless, are also disfavored. *Safeco Ins. Co.*, 26 Cal. 4th at 764.

Here, Brit contends that, whatever the scope of basic coverage under the D&O policy, due to the Partial Professional Services Exclusion, it is not required to defend or settle claims arising from professional services performed by ePlanning "for the benefit of any other entity or person." Because plaintiffs' claims derive from ePlanning's purchase of securities and its provision of other services for their benefit, Brit maintains the exclusion applies, regardless of whether the firm also benefitted from performance (for example, by earning a fee for its service). Thus, under Brit's

1   reading, the D&O policy only covers professional services ePlanning provided for its own, sole
2   benefit. Brit insists this language is "clear and explicit," and must be given its "ordinary and
3   popular sense." *MacKinnon*, 31 Cal. 4th at 647-648. It asserts there is no other reasonable reading.
4         Plaintiffs assert that the exclusion means precisely the opposite, or is at least ambiguous.
5   They argue it does not apply to ePlanning's purchase of securities for its clients' benefit because
6   ePlanning earned significant commissions on those transactions. In other words, they maintain that
7   services benefitting both ePlanning and its clients are not subject to exclusions. Plaintiffs thus seek
8   to limit the exclusion's applicability to services performed *solely* "for the benefit of any other entity
9   or person."[5] Anticipating defendants' objection that their own reading renders the limitation
10  practically meaningless, plaintiffs argue that the exclusion would still apply, for example, in the
11  event ePlanning provided professional research services for the benefit of an affiliated firm (such as
12  AREI), free of charge.[6] In urging this alternative reading, plaintiffs emphasize, "[a]n insurer cannot
13  escape its basic duty to insure by means of an exclusionary clause that is unclear … The burden
14  rests on the insurer to phrase exceptions in clear and unmistakable language … The exclusionary
15  clause must be conspicuous, plain and clear." *State Farm Mut. Auto. Ins.*, 10 Cal. 3d at 201-202.
16  To be sure, if an examination of the contract "as a whole, and in context" reveals any other
17  reasonable reading, the Court must resolve the ambiguity in favor of the insured. *Minkler v. Safeco*
18  *Ins. Co. of America*, 49 Cal. 4th 315, 322 (2010) (citing *MacKinnon*, 31 Cal. 4th at 648).
19        In a recent case, this Court was called upon to construe virtually identical exclusionary
20  language, and rejected the very argument now advanced by plaintiffs. *See Young v. Illinois Union*
21  *Ins. Co.*, No. 07-05711, 2008 WL 5234052, at *1 (N.D. Cal. Dec. 15, 2008), *aff'd* 366 Fed. Appx.
22  777 (9th Cir. Feb. 22, 2010). In *Young,* the exclusionary language exempted from coverage acts,
23  errors, and omissions committed in connection with the performance of legal services by the insured
24  "for the benefit of any other entity or person." *Id.* at *1. Young, the insured, was retained by a
25  client who later brought suit against him for malpractice. Young attempted to argue that the legal

---

[5] Brit maintains the exact opposite – that the clause applies only to services provided by ePlanning's for its own, sole benefit.
[6] They argue this contingency is not theoretical because ePlanning was one of several firms acting in concert controlled by a few individuals.

ORDER GRANTING MOTIONS TO DISMISS
NO. CV. 11-04956
AND RELATED ACTIONS

7

1  services he provided to his client also benefitted a third party. On summary judgment, the Court
2  found that the professional services exclusion applied, barring coverage. *Id*. Brit notes that Young
3  almost certainly received a fee for his services, and yet coverage was excluded. While that issue is
4  not discussed in *Young*, the ultimate result nonetheless implicitly supports Brit's reading of the
5  language at issue. Plaintiffs point out that *Young* was decided at summary judgment, and while that
6  is true, they cannot point to any significant evidence developed in that case which is absent here.
7  Rather, *Young* turned on a straightforward interpretation of the language appearing on the face of the
8  policy.

9       Here, the exclusionary language is clear, and its meaning equally unmistakable. Plaintiffs
10 would likely prevail if the exclusion applied to services performed "*solely* for the benefit of any
11 other entity or person." That is not, of course, how the exclusion is actually worded, and as a result,
12 it cannot reasonably be read to encompass plaintiff's proffered meaning. To contemplate that
13 interpretation of the clause would be to turn the exclusion on its head – rendering it generally
14 inapplicable, rather than generally applicable, to ePlanning's servicing of clients. Such a
15 construction would, in effect, add words to the contract and create ambiguity where none presently
16 exists.[7] The exclusionary clause itself is also sufficiently "conspicuous, plain and clear" to be
17 enforceable.[8] *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004).

18      Falling back on alternative arguments, plaintiffs insist that accepting Brit's reading of the
19 professional services exclusion would effectively deprive the D&O policy's third insuring clause of
20 any significance and render the entire policy a nullity. The third insuring clause provides:
21 "Underwriters shall pay on behalf of the Company Loss resulting from any Claim first made against
22 the Company during the Policy Period for a Corporate Act." If the provision of professional
23 services to third parties is excluded, then for a securities firm such as ePlanning, the foregoing
24 insuring clause has no effect, plaintiffs contend. Such an interpretation, plaintiffs maintain, would

---

[7] Plaintiffs also maintain that the term "partial," as in "Partial Professional Services Exclusion" is ambiguous. The obvious answer to this passing suggestion is that the exclusion is "partial" in the sense that it exempts professional services rendered for the benefit of third parties, but not for the insured's own benefit, from coverage. The modifier thus fully supports Brit's reading.
[8] Plaintiffs appear to argue that the exclusion is buried in the middle of the policy. As defendants note, however, it is easy to read, identified by name, and set forth in capital, bold letters. Plaintiffs' contention therefore fails.

ORDER GRANTING MOTIONS TO DISMISS
NO. CV. 11-04956
AND RELATED ACTIONS

8

violate the general tenet that all terms must be given effect to all of the policy's provisions.  Cal. Civ. Code § 1641.  Putting it a more broadly, plaintiffs argue that to accept Brit's interpretation would render the entire policy meaningless or illusory.  *Scottsdale Ins. Co. v. Essex Ins. Co.,* 98 Cal. App. 4th 86, 94-95 (2002) (contract for insurance is illusory and there is no agreement if one party assumes no obligations).  The latter contention is inaccurate.  As *Young* and other cases recognize, "[i]n order for a policy to be deemed illusory, it must afford no coverage whatsoever." 2008 WL 5234052, at *1.  Here, viewed in its entirety, the policy is not rendered illusory because, even if the exclusion is construed as Brit urges it must be, the policy still provides some insurance coverage.  For example, the first insuring clause of the policy still affords coverage for claims brought against directors and officers for individual acts.

As for plaintiffs' argument that Brit's reading would render only the third insuring clause meaningless, that argument is also simply incorrect.  Plaintiffs assert that if Brit's interpretation is accepted, "no coverage exists for *any* securities law violation allegedly committed by ePlanning because such claims necessarily arise from the rendering of a professional service" (emphasis in original).  (Joint Opp'n to Mot. to Dismiss 13:10-12).  In so arguing, plaintiffs conveniently ignore the fact that coverage remains under Brit's reading of the exclusion, albeit limited to "Securities Law Violation[s]" that are not committed in the course of performing professional services for the benefit of third parties.  For example, Brit submits that the third clause provides coverage for (1) shareholder derivative actions, brought by shareholders on behalf of the company against the company or its officers or directors, for securities violations, *see Abercrombie & Fitch Co. v. Federal Ins. Co.*, No. 06-00831, 2007 WL 2359780, at *1 (S.D. Ohio Aug. 16, 2007) (seeking coverage for shareholder derivative claims brought against insured for securities violations), and (2) Securities and Exchange Commission (SEC) investigations constituting "securities claims." *See, e.g., MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 162 (2d Cir. 2011) (SEC's request for documents qualified as "securities claim" under D&O policy).  *See also Young*, 2008 WL 5234052, at *1 (derivative claims expressly carved out from professional services exclusion).  Thus, although plaintiffs repeatedly assert that any reading which completely eviscerates coverage under the third insuring clause defies their reasonable expectation of coverage, *see MacKinnon*, 31 Cal. 4th at 648,

that argument is not responsive to Brit's position or the clear and explicit meaning of the language of the policy.

Although plaintiffs also suggest that Brit may have adopted positions inconsistent with the arguments it advances here, that observation is entirely speculative, and does not justify further discovery. More to the point, plaintiffs have not identified any specific extrinsic evidence that would be relevant, given the clear language of the exclusion. Because there is no ambiguity in the policy, there is also no need to discuss the scope of coverage under the E&O policy, and the possibility, discussed by the parties, that it may be duplicative. As a matter of law, the exclusion at least applies to ePlanning's sale of securities to plaintiffs. Accordingly, plaintiffs' claims, to the extent they are advanced on the basis of these securities sales, fall within the exclusion, and must be dismissed for failure to state a claim under Rule 12(b)(6).

The only remaining issue is whether or not plaintiffs have sufficiently stated any claims that fall within the policy's affirmative grant of coverage and yet do not trigger the exclusion – i.e., do not "arise out of" ePlanning's performance of "professional services." The *Ambrosio* plaintiffs, at least, allege ePlanning or its agents: (1) improperly burdened one of the properties underlying the securities sold to plaintiffs with an "unauthorized" second loan, thereby overleveraging it and (2) improperly commingled investors' funds. (*See, e.g.,* Ex. D to Fox Decl. in Supp. of Mot. to Dismiss ¶¶ 28-42 in *Ambrosio, et al., v. Certain Underwriters at Lloyd's Under Policy No. B0146LDUSA0701030*, No. 11-04956).[9] In particular, plaintiffs allege that ePlanning's agents played some role in encumbering the Newhall property with a junior lien, and commingling funds of investors in the Newhall property with those of other AREI-syndicated investments. *Id.* Plaintiffs describe this alleged misconduct as "mismanagement and business wrongdoing that does not arise from the rending of *any* professional services," and assert that it constituted breach of fiduciary duty and unfair business practices, independent of the securities law violations (emphasis in original).

---

[9] Although the *Ambrosio* plaintiffs' underlying complaint, attached as Exhibit D to the Fox Declaration in Support of Defendant's Motion to Dismiss, is not attached to the pleadings or the subject of an accompanying motion for judicial notice by either party, its allegations are central to plaintiffs' claims, no party questions its authenticity, and plaintiffs specifically cite it in support of their Opposition Brief. It is therefore properly before the Court. *See infra* note 3 *and Branch*, 14 F.3d at 454.

NO. CV. 11-04956
AND RELATED ACTIONS
10

(Joint Opp'n to Mot. to Dismiss 22:16-18). Accordingly, plaintiffs urge that such claims are not related to ePlanning's provision of professional services, and therefore not embraced by the exclusion discussed above.

In advancing this position, plaintiffs rely heavily on *Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 987-992 (2009). In that case, defendant Food Pro, the insured and an engineering firm, was providing consulting services at a food processing plant. Specifically, Food Pro was performing a supervisory role, limited to coordinating the overall process of installing industrial equipment at the plant, and ensuring that the job was completed in a timely manner. *Id.* at 987-988. According to the Court of Appeal, significantly, it fell to the sub-contractors doing the labor to ensure the safety of the site and to complete each individual step of the project. During installation, unfortunately, a worker fell through a hole in the floor created by the removal of certain equipment. Litigation ensued, and Food Pro eventually brought suit against its insurer, which invoked the underlying policy's professional service exclusion to justify its denial of coverage. The trial court, siding with the insurer on a number of factual issues, entered judgment in its favor. Overturning the trial court's factual findings, the California Court of Appeal held that Food Pro's potential liability arose only from ordinary negligence principles, not its performance of professional services, such as its "designs or specifications for the relocation and installation of [the plant's] processing operations, or other engineering work." *Id.* at 989. It therefore rejected the insurer's contention that any act Food Pro undertook at the site necessarily entailed professional services. *Id.*

In so doing, the *Food Pro* Court distinguished the facts before it from those of other cases. In *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal. App. 4th 704, 713 (2002), for instance, plaintiff, an escrow company, wrongfully failed to close escrow in a property transaction. The insurer refused to cover the homeowner's claims against the escrow company, invoking the policy's professional services exclusion. *Tradewinds*, purporting to summarize the relevant case law, held that that the inquiry turns on "whether the injury occurred during the performance of the professional services," rather than whether the professional services were the instrumentality of the injury. *Tradewinds*, 97 Cal. App. 4th at 713 (citing *Antles v. Aetna Casualty & Surety Co.*, 221 Cal.

App. 2d 438, 443 (1963)). *Food Pro* distinguished *Tradewinds* as reflecting no dispute as to whether escrow services were those to which the exclusion applied, and held that the correct question is whether the injury "arose from the performance of a professional service, not merely at the same time the insured was otherwise providing professional services to a third party." 169 Cal. App. 4th at 991. Applying this standard, the Court of Appeal found the insurer had breached its duty to defend.

Brit does not dispute the standard articulated in *Food Pro*, but maintains that the phrases "arising out of" and "professional services" must be construed broadly. It argues that "arising out of" means "originating from," "growing out of," or "flowing from." *See Davis v. Farmers Ins. Group*, 134 Cal. App. 4th 100, 107 (2005). Here, although the D&O policy actually uses the phrase "in connection with," rather than "arising out of," the phrases appear synonymous and neither party has suggested any identifiable difference. As for "professional services," that term also is left undefined by the D&O policy. The cases, however, interpret that phrase to mean any service "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *Tradewinds*, 97 Cal. App. 4th at 713. *Accord PMI Mortg. Ins. Co.*, 394 F.3d at 766.

While this is a fairly broad definition, as *Food Pro* strongly suggests, it does not necessarily follow that any activity that co-occurs with, or is remotely related to, the performance of professional services, is covered by an otherwise applicable exclusionary clause. Not all acts associated with a given profession are professional, within the meaning of the law; the errors of a professional who is not acting in her professional capacity presumably would not be covered by an ordinary professional services exclusion. This observation has led courts in other jurisdictions to find that certain routine administrative and business practices that do not engage the specialized knowledge and skills denoted as "professional," such as billing and fee-setting activities, do not fall within the meaning of that term. *See, e.g., Medical Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 515-16 (1st Cir. 1998) (applying Massachusetts law to find professional liability policy does not cover insured's fee-setting activities), *and Greg & Valby,*

*L.L.P. v. Great Am. Ins. Co.*, 316 F. Supp. 2d 505, 513-15 (S.D. Tex. 2004) (billing and fee-setting practices do not qualify as professional services under policy's insuring clause).

Here, even acknowledging all this, it is difficult to see how plaintiffs could prevail on their current pleadings, except under an artificially constrained understanding of the Partial Professional Services Exclusion. Plaintiffs insist that "ePlanning's professional expertise is obviously not at issue, for none of these acts or conduct" – mismanaging the real estate projects underlying the securities sold to plaintiffs, and misusing investors' funds after the securities were sold to them – "involved the sale of securities or the rendering of financial advice." (Joint Opp'n to Mot. to Dismiss 24:20-22). While it is true that the alleged acts cannot be literally equated with the sale of securities or financial advising, the proper question under the Partial Professional Services Exclusion clause is whether ePlanning's misconduct occurred "in connection with the performance of any professional services." This standard sweeps more broadly than plaintiffs are willing to acknowledge, and their suggestion that ePlanning's alleged misconduct is entirely unrelated, in the end, is simply not tenable.

A securities broker-dealer or financial advisor who receives a client's funds for the purpose of investment, and then commingles those funds, or mismanages the assets he or she recommends and subsequently acquires on the client's behalf, commits wrongs "in connection with the performance of professional services." To say, as plaintiffs do, that the commingling of funds constituted an independent breach of ePlanning's fiduciary duties does not remove the allegation from the ambit of professional services. After all, the alleged fiduciary duty arises from the trust reposed in the advisor as the custodian of client funds. Likewise, to the extent ePlanning was involved in the undisclosed encumbrance of the real estate underlying the assets it sold to plaintiffs, those activities, even if they constitute unfair business practices, relate directly to ePlanning's performance as a financial advisor. Contrary to plaintiffs' suggestions, these are not activities that are purely incidental to ePlanning's role as a financial advisor or broker-dealer, or merely routine administrative matters requiring no special expertise. Ultimately, it is the nature of the conduct, not the source of law, that governs whether the exclusion applies, and here, unlike *Food Pro*, plaintiffs are attempting to apply ordinary negligence and tort principles to ePlanning's performance of

ORDER GRANTING MOTIONS TO DISMISS
NO. CV. 11-04956
AND RELATED ACTIONS
13

professional services. Accordingly, given the current state of the pleadings, plaintiffs have failed to allege any viable claims falling outside the ambit of the D&O policy's Partial Professional Services Exclusion, and Brit's motions must therefore be granted.[10]

Although a fairly close question, leave to amend is appropriate in this instance because of the extensive misconduct alleged by plaintiffs, and the liberal policy permitting amendment "when justice so requires." Fed. R. of Civ. P. 15(a)(2). While the core of plaintiffs' complaints not surprisingly concern ePlanning's sale of securities and performance of related professional services, they should be afforded the opportunity to develop any claim not so focused. Accordingly, plaintiffs may, if they elect and have a good faith for doing so, amend the pleadings to allege facts supporting claims that do not fall under the Partial Professional Services Exclusion.

B. Motion to Strike

Brit also moves to strike plaintiffs' prayer for punitive damages in six of the eight related cases. It argues that plaintiffs are not entitled to recover punitive damages as a matter of law on the basis of assigned interests, regardless of the merits of their claims. *See Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937, 942 (1976). Plaintiffs do not read their pleadings to request punitive damages, but do not oppose the motion to strike. As the motions to dismiss must be granted, and the parties do not appear to disagree on the law concerning damages, the motion to strike will be denied without prejudice to a renewal by defendants depending on the averments of any amended complaints.

IV. CONCLUSION

For the reasons stated, from the face of the complaints, the professional exclusion clause applies to plaintiffs' claims, and ePlanning's alleged conduct falls within the rubric of "professional services." Therefore, no coverage is available, and plaintiffs' claims must be dismissed with leave to amend. In the event plaintiffs elect to file an amended complaint, they must do so <u>within 20 days of the date of this Order.</u> The motion to strike is denied without prejudice.

IT IS SO ORDERED.

Dated: 3/29/12

---

[10] This holding encompasses all claims advanced by plaintiffs in these eight related actions.

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE