Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

| | |
|---|---|
| AMBROSIO, et al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | ) NO. C 11-4956 RS |
| | ) |
| CERTAIN UNDERWRITERS AT LLOYD'S | ) |
| UNDER POLICY NO. | ) |
| B0146LDUSA0701030, and all related | ) |
| matters. | ) |
| | ) San Francisco, California |
| Defendants. | ) Thursday |
| | ) August 9, 2012 |
| _____ | ) 1:30 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**         LAW OFFICES OF GEORGE DONALDSON
**Ambrosio:**           2298 Durant Avenue
                   Berkeley, California 94704
            **BY:  GEORGE DONALDSON, ESQ.**


**For Plaintiff**         **RICHARD S. MILLER, ESQ.**
**Anderson:**           Attorney At Law
                   1600 South Main Street
                   Suite 230
                   Walnut Creek, California 94596


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

<u>**APPEARANCES:   (CONTINUED)**</u>

**For Plaintiff**          MAIRE & BURGESS
**Nowacki & Oakdale:**     2851 Park Marine Drive
                           Suite 300
                           Redding, California 96001
                    BY:  **PATRICK L. DEEDON, ESQ.**


**For Plaintiff**          LESSER LAW GROUP
**Jamison:**               1010 B Street
                           Suite 350
                           San Rafael, California 94901
                    BY:  **DON A. LESSER, ESQ.**


**For Plaintiff**          CAPPELLO & NOEL, LLP
**Roseville:**             831 State Street
                           Santa Barbara, California 93101
                    BY:  **MATTHEW DAVEGA, ESQ.**


**For Defendants:**        SEDGWICK, LLP
                           333 Bush Street
                           30th Floor
                           San Francisco, California 94104
                    BY:  **MICHAEL L. FOX, ESQ.**
                         **JAMISON R. NARBAITZ, ESQ.**


_ _ _ _

```
 1                   P R O C E E D I N G S
 2   AUGUST 9, 2012                                1:37 p.m.
 3             THE CLERK:  C11-4956, Ambrosio versus Certain
 4   Underwriters at Lloyd's and all related matters.
 5        Please come forward and state your appearances, please?
 6             MR. DONALDSON:  Good afternoon, your Honor.  George
 7   Donaldson on behalf of the Ambrosio plaintiffs.
 8             MR.  MILLER:  Good afternoon, your Honor.  Richard
 9   Miller appearing on behalf of the Anderson plaintiffs.
10             THE COURT:  Good afternoon.
11             MR. DEEDON:  Good afternoon, your Honor.  Patrick
12   Deedon on behalf of the Nowacki and Oakland Heights plaintiffs.
13             MR. HARRISON:  Good afternoon, your Honor.  Matthew
14   Harrison appearing on behalf of the Jamison plaintiffs.
15             THE COURT:  Good afternoon.
16             MR. DAVEGA:  Good afternoon, your Honor.  Matthew
17   Davega on behalf of the Roseville plaintiffs.
18             THE COURT:  Good afternoon.
19             MR. LESSER:  Good afternoon, your Honor.  Donald
20   Lesser on behalf of the Jamison plaintiffs.
21             THE COURT:  Good afternoon.
22             MR. FOX:  Good afternoon, your Honor.  Michael Fox on
23   behalf of defendant Brit UW, Limited.
24             THE COURT:  Good afternoon.
25             MR. NARBAITZ:  Good afternoon, your Honor.  Jamison
```

1  Narbaitz also on behalf of defendant.

2          **THE COURT:**  Good afternoon.

3      I am sorry that initially there was a bit of a mixed

4  message for me in initially I determined that I could decide

5  the pending question, pending motions on the papers.

6      As I got more deeply into it, I rethought that and

7  determined that there were some issues that I thought I would

8  benefit from having fleshed out in oral argument, so that's how

9  we all happen to be here.

10     I did give you some very -- a couple of very general

11  questions to -- or issues that I wanted to have you be prepared

12  to discuss.

13     Perhaps my questions, I think, go in particular to some of

14  the arguments that the Jamison plaintiffs have advanced.  So

15  those -- whoever is going to speak on behalf of Jamison group,

16  may want to just come forward.

17     Let me just start the discussion with something that

18  was -- that I indicated would be an area that I wanted to

19  discuss with you, and that's this concept of whether or not

20  there is some indirectly connected conduct that the plaintiffs,

21  the Jamison plaintiffs in particular, are saying would be

22  covered or would be outside the partial professional services

23  exclusion.

24     First of all, that is one of the things you contend, is

25  that right?

1          **MR. LESSER:**  It is, your Honor.  It's one of our

2    alleged interpretations of the policy.

3          **THE COURT:**  What I need some clarification on is what

4    are the -- what's the factual bases that you would look to to

5    show that there was such conduct, putting aside for the moment

6    the question of whether or not that legal interpretation is the

7    appropriate contract interpretation as to the meaning of the

8    policy.

9          So, in other words, what is this indirect -- what are

10   these indirect conduct that you think would be potentially

11   covered by the D&O policy?

12         **MR. LESSER:**  I see.  I would be happy to address

13   that, your Honor.  I think I need to address that in two ways.

14         One is, perhaps, to put a little bit more of a finer point

15   on what it is we mean by "direct" versus "indirect."  I think

16   you have to understand that, of course, before you go on to

17   talk about the alleged activity that falls outside the

18   exclusion.

19         **THE COURT:**  Certainly happy to have you do that, but

20   just remember that at the end of the day under *Twombley* and

21   *Iqbal* it's not enough to say:  We have a legal theory.  You've

22   got to be able to say:  These are the basic facts that show we

23   have a plausible basis.

24         So as long as you promise you get back to that, you can

25   start as you suggest.  Go ahead.

1          **MR. LESSER:**  I will, your Honor.

2          On that point, we make two types of factual allegations in

3    the complaint.  We make factual allegations about what we

4    believe the reasonable -- at least one reasonable

5    interpretation of the exclusion to be other than the one urged

6    by Lloyd's, and typically in a contract dispute it's the --

7    it's the plaintiff's burden to plead what the interpretation or

8    interpretations are.  And so we have done that, both from the

9    perspective of the language of the policy itself, as well as

10   facts pled on information and belief as to what we believe the

11   extrinsic evidence is that will support our proposed

12   interpretation.

13         So it's supported by -- we support it both by citation to

14   policy language as well as citation to --

15         **THE COURT:**  Okay.  I understand that.  And I

16   understand that your argument is that the policy is subject to

17   the interpretation that it covers this indirect conduct and,

18   also, that supervisory liability, to the extent that the

19   parent, ePlanning, Inc., you say there is coverage under your

20   interpretation of the policy for the acts of the subsidiaries,

21   that even if there is, the exclusion would pertain to the

22   subsidiaries, you say, it wouldn't pertain to the parent.

23         **MR. LESSER:**  Right.

24         **THE COURT:**  Okay.  So I understand that.  Go ahead.

25         **MR. LESSER:**  So let me just put a finer point on the

1  interpretation that we -- that we propose of the exclusion, and

2  it goes to one particular phrase of the exclusion.

3           THE COURT:  Again, though, I really want to focus you

4  on -- I understand.  It's all set forth in your papers.

5           MR. LESSER:  Fair enough.  Fair enough.

6           THE COURT:  And I understand that you -- that's the

7  legal part of the equation.

8           MR. LESSER:  Okay.

9           THE COURT:  But, so, let's say I they were said:  All

10 right, I'll give you leave to amend.  Now you can go ahead and

11 tell me, you having established that you think this

12 interpretation of the policy language would cover indirect

13 conduct:  Judge, this is the indirect conduct that we now say

14 is subject to being covered by virtue of the policy.

15          MR. LESSER:  Very well.  I will turn directly to

16 that.

17     There are, in our view, several types of indirect conduct

18 that would be outside the ambit of the exclusion, which are

19 alleged in our complaint.

20     One type of indirect conduct is management activities,

21 both by the broker dealer and the holding company, ePlanning,

22 Inc.

23          THE COURT:  In my prior order I did find that

24 commingling and management activity was in connection with.  So

25 is this candidly an argument that I should rethink that, or is

1   this somehow different from the conduct that was discussed in

2   my prior order, where I did find that it was -- did fall within

3   the exclusion?

4          **MR. LESSER:**  Not to be -- the answer in some respects

5   is both.  We allege a different interpretation of the exclusion

6   than the plaintiffs did last time.

7      The last time the plaintiffs alleged ambiguity based on

8   the -- whether it benefited some or all of the potential

9   universe of people to be benefited by the professional

10  services.  You found that that was not a reasonable

11  interpretation of the exclusion.

12     We're here on an amended complaint that alleges an

13  entirely different ambiguity in the exclusion.  That ambiguity

14  has to do with the fact that the phrase "in connection with"

15  does not -- is silent on whether it -- whether it encompasses

16  both direct and indirect connections between the acts and

17  omissions alleged in the complaint and professional services.

18     So in that sense it does ask the Court to revisit whether

19  certain things alleged in the complaint are in connection with

20  excluded conduct, but it does so in the context of an entirely

21  different ambiguity in the exclusion.

22     And so all of the analysis, and frankly the case law that

23  the Court looked at last time around, is really, in our view at

24  least, beside the point because we're focused on an entirely

25  different ambiguity which has to be analyzed separately and

1  under whatever case law there is, if any, that addresses that

2  alleged ambiguity.

3      **THE COURT:**  Let me go at it this way.  Is the --

4  whatever analysis, legal analysis we place on the understanding

5  of the policy is the essential basic facts that you are arguing

6  trigger coverage here.  Is there anything new that you haven't

7  put in there that you would, if given leave, put in there?

8      And I understand that you've identified what you think

9  would be covered activity and that would be ongoing -- or

10  management activities that were on an ongoing basis.  The

11  commingling of funds, all of that, I understand is there.

12      Is there anything else that you want me to know is out

13  there that you would be prepared to present in a complaint?

14      **MR. LESSER:**  In terms of what conduct was alleged in

15  the underlying action?

16      **THE COURT:**  Right.

17      **MR. LESSER:**  I don't believe so, your Honor.

18      **THE COURT:**  Okay.  That's helpful.  So we have --

19  whatever, however one may label it, the activities that you are

20  telling me are covered activities or outside the exclusion are

21  set forth in -- you have already alleged them.

22      **MR. LESSER:**  Right.  I mean, they were alleged in the

23  underlying complaints.  Those complaints are incorporated

24  within our pleading.

25      So, certainly, whatever was alleged in the underlying

1   complaint is before the Court.

2           **THE COURT:**  Okay.  All right.

3           **MR. LESSER:**  So, no.  So, assuming the Court's

4   inquiry stands as your Honor phrased it, what I would turn to,

5   then, is what we have alleged in the underlying action that

6   under our interpretation of the phrase "in connection with"

7   constitutes indirect connections with professional services

8   that reasonably can't be construed as falling within the ambit

9   of the exclusion.

10          **THE COURT:**  Okay.

11          **MR. LESSER:**  And those include -- well, let me -- if

12  I might, let me just take a second to identify what we think

13  "direct connections" are, because I think that will be helpful.

14      Certainly, direct activity that is directly connected with

15  professional services, not just includes the services

16  themselves, but we would concede the other activities that go

17  on in the operation that are necessary to provide those

18  services; such as, bookkeeping, issuance of account statements,

19  making whatever required disclosures might be needed to be

20  made, those sorts of activities.  Those, we would concede fall,

21  within -- have a direct relationship with professional

22  services.

23      Beyond that, what we see as indirect, activities having an

24  indirect relationship include, first of all, companies -- acts

25  and omissions by officers or directors of the company that are

1   of the same type that are undertaken by officers or directors

2   of any corporation:  Overseeing the operations of the company

3   and its subsidiaries, engaging in risk management activities,

4   making sure -- making sure that the appropriate people are

5   appointed and that they are properly supervised and directed;

6   making sure that the company is operating in a way that does

7   not allow non- -- unlawful activity to go on, or at least

8   minimizes it; taking steps, if necessary, to respond to

9   unlawful activity that's discovered; and performing their

10  duties not as people performing professional services, but

11  their duties as officers and directors of the company in doing

12  so, in protecting the interests of the shareholders.

13      Those are activities that because ePlanning Securities

14  engages, its business is the rendering of professional

15  services.  They have an indirect relationship to the

16  performance and professional services, but it's not a

17  reasonable interpretation of "in connection with," in this

18  context, in the context of this exclusion and in the context of

19  this D&O policy, the ensuring agreement of which broadly covers

20  acts and omissions by officers and directors and managing the

21  company.

22      It's not a reasonable interpretation of the exclusion to

23  bring within it those types of management activities that every

24  D&O policy covers, that everyone would agree they are intended

25  to cover, and that generically speaking don't differ from the

1   management-related activities of any corporation.

2       And so that would be -- we submit, be one category of

3   activities that are alleged in the underlying complaint that

4   fall outside the exclusion because they only bear an indirect

5   relationship to the rendering of professional services.

6       And there is, in fact -- there are, in fact, a couple of

7   cases that are relatively on point that speak to that issue,

8   which I'll get to a little later, if the Court is interested.

9       The second category of activities that we believe are

10  indirect, indirectly related to professional services are -- is

11  conduct by insurance, whether it be the holding company or its

12  officers and directors or, for that matter, officers and

13  directors of ePlanning Securities who are not themselves, or in

14  the case of the holding company is not itself, providing

15  professional services.

16      There is a very compelling argument that no matter how

17  the -- no matter how broadly the exclusion may appear on its

18  face, it's not reasonable to construe it so broadly that it

19  applies to the activities of insureds who do not themselves

20  engage in the excluded conduct, who don't themselves engage in

21  some way, either in providing those services or in providing

22  the incidental activities involved in supporting those services

23  from being within the ambit of the exclusion.

24      And so, for example, ePlanning, Inc., the holding company,

25  we allege it does not engage in professional services itself.

1  It merely is the owner of a company that does.  And

2  particularly given that ePlanning, Inc. is not a policyholder,

3  is not insured under the E & O policy that does cover that

4  risk, it's unreasonable to construe the professional

5  services --

6         **THE COURT:**  Isn't that treating the D&O policy as --

7  it's almost as if you're arguing it's excess to the primary E&O

8  policy.

9      You're saying, well, because the parent is not -- there is

10  coverage for the risk under the E&O policy, and that policy is

11  now exhausted.

12     Now, because the corporate parent is -- doesn't have other

13  coverage, we can now assert that there is coverage by -- and

14  even though the subsidiary is no longer -- if the professional

15  exclusion kicked in, they are not covered.  We can nonetheless

16  provide coverage to the parent under that policy.  I mean, it

17  doesn't -- I'm not sure I see how that flows.

18         **MR. LESSER:**  For there to be a primary excess

19  relationship, both policies would have to cover the same

20  insureds and the same risk.  And excess policy --

21         **THE COURT:**  I'm not saying that.  I understand that,

22  but I'm saying you're sort of -- you're sort of expecting the

23  D&O policy to act in that fashion to some extent.

24     You're saying they have exhausted the coverage that's

25  provided for the risk under the E&O policy.  And the -- and if

1   the defendants are right, there is no basis to provide any

2   coverage for the subsidiary's conduct directly under the D&O

3   policy.  But for the parent, even though the actual conduct

4   isn't otherwise covered because the parent doesn't have any

5   other insurance, the D&O policy steps in to the fore.

6           **MR. LESSER:**  Your Honor, respectfully, I can't accept

7   that premise because the -- and the reason is the policies

8   insure different risks.

9           **THE COURT:**  That's fine.  It was a question.  I

10  wasn't telling you that's what you had to accept.

11          **MR. LESSER:**  The E&O policy insures acts and

12  omissions in the rendering of professional services.

13      The D&O policy insures acts and omissions in the

14  management of the policy -- of these companies.

15          **THE COURT:**  Excluding professional services.

16          **MR. LESSER:**  Excluding professional services.  And so

17  it's not --

18          **THE COURT:**  So how is it that if the subsidiaries --

19  and the premise of my question, and this is the premise of my

20  question, that the subsidiaries are -- their conduct would not

21  be covered because of the exclusion.  It is professional

22  services.

23      Your contention, if I understand it correctly, is but the

24  parent would nonetheless be covered even if the subsidiaries

25  are subject to the professional services exclusion.

1    And maybe I'm misunderstanding your argument, but that's

2   what I thought your argument was; that it almost didn't matter

3   what the decision is with respect to the -- whether or not the

4   exclusion applied to the conduct because the parent is not

5   otherwise insured.  The parent gets coverage under a secondary

6   liability theory even if the underlying conduct is covered

7   under the professional exclusion coverage.  Maybe I'm

8   misstating your argument.

9          **MR. LESSER:**  I think it all boils down, frankly, to

10   how you're going to define acts in connection with rendering

11   professional services under the D&O policy.

12          **THE COURT:**  So the policy --

13          **MR. LESSER:**  The subsidiaries -- I want to be clear

14   on this.  The subsidiaries do have coverage under the D&O

15   policy.

16          **THE COURT:**  Unless -- they do, but if the

17   professional exclusion applies, they don't.

18          **MR. LESSER:**  They don't --

19          **THE COURT:**  Right.

20          **MR. LESSER:**  They don't have coverage for their

21   professional services activities.

22          **THE COURT:**  I understand.

23    What I'm trying to get at is:  Assume for a moment that

24   the -- that the conduct engaged in by the subsidiaries does

25   fall within the exclusion.  I'm not -- just assume that for the

1   moment.

2           MR. LESSER:  Sure.

3           THE COURT:  Are you then still arguing that the

4   parent, ePlanning, Inc., would have coverage under some sort of

5   secondary liability theory; that even though it would not be

6   coverage for purposes of the subsidiary making a claim, the

7   parent nonetheless would have some coverage?

8           MR. LESSER:  Because we believe that the -- yes.

9   Because we believe the activities of the parent are only

10  indirectly related to the rendering of professional services.

11          THE COURT:  That's what I'm trying to get at.  All

12  right.

13      And the reason you think the parent would then be covered

14  is because the parent's connection to the subsidiaries' -- the

15  conduct of the directors and officers the subsidiaries is

16  indirect or because they are not otherwise covered?  Which seem

17  to be your argument that -- from a reasonable insured's

18  perspective there must be coverage and, therefore, the parent

19  gets coverage because the parent didn't have coverage under the

20  E&O policy.  So the D&O is there, in part, intended to cover

21  the parent.

22          MR. LESSER:  The parent has coverage because it is

23  being sued for act and omissions in -- in the management,

24  because its -- its officers and directors in the corporation

25  itself are being sued for what the policy defines as securities

1  law violations, which we do not believe fall within the ambit

2  of the professional services exclusion.

3      The second point your Honor mentioned, which is, is the

4  D&O sort of a backstop or some sort of secondary coverage for

5  the corp, only because the corp -- the holding company isn't

6  name in the E&O policy.

7      Our point on that is that, you know, part of your analysts

8  in determining whether a particular interpretation is

9  reasonable or not is whether it -- whether an interpretation of

10 an exclusion is reasonable or not is whether it takes away so

11 much of the coverage that's afforded to a particular insured

12 that it -- that it violates the insured's reasonable

13 expectations giving the scope of the insuring agreement.

14     Our only point is that given that ePlanning, Inc., the

15 holding company, spent $27,000 for this policy in 2006 when it

16 had net income of about 54,000, and in 2007 had net income --

17 in the first six months had income of $54, it's unreasonable to

18 think that the holding company would have spent $27,000 for a

19 policy that would provide no protection against these

20 indirect -- against lawsuits alleging indirectly-related --

21 activities that are indirectly related to the professional

22 services that its subsidiary provides.

23     It may well be that under Lloyd's interpretation of the

24 exclusion, you could, if you try really hard, speculate about a

25 few types of claims that might still be covered.  Nevertheless,

1   if you look at the cost of the -- the cost of the policy, the

2   scope of the insuring agreement, and the extrinsic evidence we

3   allege in the complaint about the parties' pre-policy

4   negotiations, it's an unreasonable interpretation to construe

5   the exclusion that broadly because it would mean that the

6   holding company has no coverage for the most central, most

7   likely types of claims that it's going to face given the

8   operations of its subsidiary.

9           **THE COURT:**  Okay.  Before I turn to the defense side,

10  let me just ask you a couple of questions about kind of the

11  plaintiff's side of the equation here.

12      The Jamison plaintiffs are the ones advancing the

13  particular theories that we have been discussing.

14      The other plaintiffs, as I understand it -- well, I was

15  looking back to see had they joined or what was going on.  What

16  is the position of the non-Jamison plaintiffs as to, you know,

17  the arguments that are being made by your co-plaintiff?

18      And the other part of the question is:  If you are saying

19  these arguments are ones we want to advance as well, where do I

20  find the joinder in those arguments or some indication that

21  that's the position that you're taking?

22          **MR. DONALDSON:**  George Donaldson on behalf of the

23  Ambrosio plaintiffs.

24      You know, I'm kind of looking at this issue in a different

25  way, I believe, than the Jamison plaintiffs, but in some

1  respects the two intersect, and let me try to explain what I

2  mean by that.

3      Your Honor's opinion raised the notion of the "in

4  connection with" phrase and whether or not there is a

5  distinction between "direct" and "indirect" and how does it

6  relate to the facts of this case.

7      As you will recall from the last hearing and from your

8  opinion, it was the Ambrosio complaint that alleged certain

9  activities which we believe were outside the ambit of the

10  professional services exclusion.

11          **THE COURT:**  Right.

12          **MR. DONALDSON:**  And I believe the Court's opinion

13  was -- in light of the phrase "in connection with professional

14  services," you deemed that it was embraced by the exclusion.

15          **THE COURT:**  Right.

16          **MR. DONALDSON:**  And in response to that, we put in

17  some additional extrinsic evidence, which we believe

18  demonstrate that the Court's conclusion in that regard is

19  incorrect and that Brit's argument is incorrect and it really

20  relates to the concept of what constitutes "in connection with"

21  in this context and, also, when is the proper definition of

22  professional services.

23          **THE COURT:**  Right.  And that helps me answer the

24  question in part.

25      What I'm trying to get at is, I'm familiar with the fact

1  that you have made the arguments that you've made and you've

2  just gone through them.  Are you also embracing the arguments

3  that the Jamison plaintiffs are making or not?  And if you are,

4  tell me where you told me that you were.

5       **MR. DONALDSON:**  Well, I think that we -- that I am in

6  regards to the issue of the concept of "indirect" versus

7  "direct" --

8       **THE COURT:**  Well you've -- I'm quite familiar with

9  the fact that you have made -- advanced your own arguments and

10  I have them.  I'm not suggesting I haven't seen them.

11      What I want to know is:  Should I focus on the particular

12  plaintiff's arguments, you've made yours, or, you know,

13  oftentimes parties join each other's arguments.

14      **MR. DONALDSON:**  Right.

15      **THE COURT:**  And in this instance it did not appear to

16  me that the parties were joining each other's arguments.  That

17  may be good or bad.  I'm not suggesting you should or you

18  shouldn't.  I just want to know who is making what argument.

19      And as I understand it, as I looked at the record, it did

20  not appear that the other plaintiffs were joining in the

21  Jamison plaintiff's particular analysis of this question.

22      You all responded to my order, fine.  And you make your

23  own arguments.  That's -- it's a narrower question than,

24  perhaps, you're trying to answer right now.

25      **MR. DONALDSON:**  Well, insofar as the Jamison

1  plaintiffs are contending that the -- that the E&O policy does

2  not have applicability to -- I'm sorry, the D&O policy does not

3  have applicability to the subsidiaries, I don't join in their

4  argument, but I don't think they are saying that.

5       I think they are saying that insofar as you determine that

6  it's a professional service, then it's not going to apply.  But

7  if it's not a professional service, then it will apply.  So to

8  that extent, yes, I am joining in their argument.  I don't know

9  if that answers your Honor's question.

10      The argument is a little bit complicated and there are

11 pieces of it that I think -- that are different than my case,

12 and so --

13           **THE COURT:**  I'm trying to ask -- perhaps I'm not

14 asking it right.  I'm really asking a simpler question.  I'm

15 not asking each party to tell me how they think their argument

16 may overlap with the argument of another party.  I'm asking a

17 very basic procedural question.

18      The parties are called upon to either embrace or not

19 embrace their co-parties' arguments and they usually do that by

20 saying, "We join in that brief."  "We join in those arguments."

21 Or, "We don't."  And my understanding is there wasn't been that

22 joinder.

23      That doesn't mean that there may be aspects of your

24 argument which do not overlap with there -- which overlap with

25 their argument.  I understand that.  You're not all going off

1  in completely different directions.

2      So I'm not asking you to tell me where the overlap is.  I

3  just want to make it clear that as far as I understand it, you

4  have not formally adopted the other plaintiffs' arguments, as

5  parties often do, by saying, "Here is our brief and we join in

6  theirs."  And you haven't done that, is that fair?

7          **MR. DONALDSON:**  I think that's fair, but I think it's

8  fair because at least insofar as the timing of the motion

9  practice occurred, I was actually in the middle of a trial and

10 we didn't really get together and talk about it for the

11 purposes of a joinder.  So I didn't file a joinder.  I filed my

12 own brief.

13     The answer to your question is:  Based on what was said

14 today, I would join in those arguments, but I would say that I

15 have a situation that I believe that I would at least like to

16 present to the Court that is different than has been presented.

17 Maybe you don't want to hear that now or maybe you don't want

18 to hear that at all.  I'm not sure.

19         **THE COURT:**  I at this point want to give the defense

20 a chance to at least respond so far, then maybe we will go

21 beyond that.

22     But just the other plaintiffs, can each of you just tell

23 me how you perceive the argument being made?  Are you making

24 your own argument?  Are you joining in your co-parties'

25 arguments?

```
 1            MR. DAVEGA:  The Roseville plaintiffs, your Honor, we
 2   actually filed a joinder of all the briefs.
 3            THE COURT:  That answers my question for you.
 4            MR.  MILLER:  Yes, your Honor.  Richard Miller.  We
 5   join in the argument.
 6            THE COURT:  Did you do it?
 7            MR.  MILLER:  We did not.
 8            THE COURT:  Well, I'm not necessarily agreeing that
 9   you can do that at this juncture.  I just want to know what the
10   record reflects.
11            MR.  MILLER:  We did not file a joinder.
12            MR. DEEDON:  Patrick Deedon for the Nowacki and
13   Oakdale plaintiffs, your Honor.
14      We did not file a formal joinder in any of our motions
15   because they were all filed at the same time and, quite
16   frankly, we did not have much opportunity to review their work
17   before it was filed.
18            THE COURT:  Not necessarily before it was filed.
19   sometimes you file a joinder afterwards, but okay.
20            MR. DEEDON:  But I do join in the arguments that
21   Mr. Harrison did proffer today.
22            THE COURT:  Okay.  All right.  Mr. Fox?
23            MR. FOX:  Could I briefly address that issue?
24      As you just heard, your Honor, there was actually only one
25   formal joinder filed.  That was by Roseville.  And there is
```

1  this talk about them not having the opportunity to coordinate.

2      In fact, they requested an extension of time for purposes

3  of being able to coordinate briefing, and we filed that

4  stipulation, and they had that opportunity.

5      So to the extent that there is some belated efforts to try

6  and jump on the Jamison bandwagon here, if it's necessary at

7  all, I think it's half-hearted, your Honor.  They had that

8  opportunity and only one of the groups of plaintiffs joined, as

9  you just heard from them.

10      Your Honor, I had a chance to, of course, listen to the

11  arguments of counsel and I didn't really hear him ever get to

12  answer your question.

13      Your first question, when you were talking about where is

14  the alleged conduct, I think by the end he finally agreed they

15  had alleged no additional conduct.  They didn't follow your

16  order.  They didn't go back to the underlying claims and find

17  conduct which falls outside of the partial professional

18  services exclusion, which you determined to be clear,

19  unequivocal, unambiguous perhaps.  But you used even more --

20          **THE COURT:**  Now, they are saying to me:  You need to

21  look at this in a bit of a different way.  And that's where the

22  *PG&E* case is of some consequence, I think, in what I want you

23  to address.

24      You know, I've issued the order that I issued and it's

25  there for all to see and you've all responded to it, but I

1  suppose when I call it a motion to reconsider or a motion to

2  reassess or whatever, what I'm trying to get a handle on is in

3  light of *PG&E*, can I call the questioner -- put aside what I

4  issued before, and I obviously gave leave to amend with the

5  notion that there might be some additional factual averments.

6      I think you're right.  In the case the parties have

7  indicated, plaintiffs indicated they are going to rise or fall

8  effectively on the factual basis that's been presented.

9      So then the question reverts back.  Should I look at this

10 anew in light of the fact that the *PG&E* case seems to say if

11 there is any reasonably plausible or any exact -- any

12 interpretation that's reasonably susceptible that you can't

13 necessarily call the question, you have to consider the

14 admission and consideration of parol evidence as to what the

15 parties intended the provision to apply for.  So, perhaps you

16 can address that.

17      **MR. FOX:**  Well, to that point your Honor, the cases

18 and *PG&E* says this, as well as the most recent case, one of the

19 most recent cases *George*, which is a 2011 case, in a pleadings

20 context talks about how the Court can actually provisionally

21 consider whatever extrinsic evidence they are coming forward

22 with and disregard it if it doesn't go towards proving, tending

23 to prove the mutual understanding of the parties.  Not one

24 party's subjective intent.  Not what one party hopes the

25 language might have meant.  But evidence of mutual

1  understanding of the parties of what seems to be unambiguous --

2  I am sorry, what seems to be ambiguous language.

3       That's not the case here.  What they have come forward

4  with is proffered extrinsic evidence, some allegations of what

5  they think the evidence might be related to the parties'

6  negotiations of the insurance contracts, as well as the actual

7  issuance of the contracts; themselves, those two items as

8  evidence of additional terms of the contract.

9       They aren't trying to explain what the partial

10  professional services exclusion means.  They are trying to add

11  terms to the contract.

12            THE COURT:  If I'm following your argument, that's

13  really a two-part argument.

14       The part one, if I understand it correctly, is to say:

15  Well, your decision initially that there was fairly clear

16  meaning to the language of the exclusion, you know, we think

17  you should go with that.

18       But to the extent that PG&E would warrant consideration of

19  the extrinsic evidence -- your initial argument is there is an

20  integration clause and we don't get there.  We don't even get

21  to extrinsic evidence to understand if the terms -- if the

22  terms are clear.  Isn't that your threshold argument?

23            MR. FOX:  To determine whether or not it's ambiguous.

24            THE COURT:  But then if I understand you correctly,

25  you're saying even if you get to the *PG&E* point and you say:

1   All right, let's consider extrinsic evidence to determine if

2   there is a reasonably susceptible interpretation of this

3   language that would be consistent with the plaintiffs' view of

4   it, you're saying they didn't come forward with anything that

5   would reflect that there is a -- some sort of altered

6   interpretation of the terms of the insurance agreement?

7           **MR. FOX:**  Well, again, we're supposed to be talking

8   about the specific terms of the partial professional services

9   exclusion.

10          **THE COURT:**  Correct, correct.

11          **MR. FOX:**  So my point was, if you look at what

12  extrinsic evidence they are proffering, they are not trying to

13  give meaning to the partial professional services exclusion or

14  give a reasonably susceptible meaning.  They are adding terms

15  to the insurance contract, which is different.

16      It's one thing to have a vague term in the policy which no

17  one understands what it means, can't figure out.  There is ten

18  dictionary definitions and a number of cases which have applied

19  it a whole bunch of different ways, and the Court says:  I need

20  to tell the parties what the law is going to be in this case

21  and I need to interpret the contract.

22          **THE COURT:**  What terms do you say they are attempting

23  to add to the exclusion?

24          **MR. FOX:**  Absolutely.  They are trying to add two

25  terms.

1    The first would be to add a definition of "professional

2  services."  That's one argument which they have made, which is

3  that the definition --

4          **THE COURT:**  It's defined in the E&O policy.

5          **MR. FOX:**  The definition of "professional services"

6  in the E&O policy is the one which you should inject in the D&O

7  policy.

8    I'll address that in a second, but I don't think that

9  makes any difference when you read the exclusion as a whole;

10  which is to exclude coverage for acts or omissions in

11  connection with those professional services, arising out of

12  those professional services.  Language, which again, the

13  proffered evidence doesn't go to change.

14    The proffered evidence, "professional services," was

15  supposed to be the same in both policies.  Doesn't change

16  anything you.

17    The second thing which they want you to do is add "direct"

18  or "indirect" before "connection."  And that, again, is

19  something which we already addressed the first time around.

20  That's really the -- if you remember, and I'm sure you've read

21  your opinion.  I don't need to go back through it.  But that's

22  the *Food Pro* argument.  How many of these alleged activities

23  are -- arise out of the financial advisory services, the

24  professional financial advisory services provided by ePlanning

25  Securities and ePlanning advisors and which of them aren't?

1    And they have not come forth with any -- that's my point

2    which I started with, your Honor, and which they conceded.

3    There is no new underlying claims that get there.  There is

4    nothing which -- that's why we're really talking about

5    reconsideration.  You have asked several times of them and it

6    gets down right here.  Where is the new alleged conduct?  Where

7    is conduct in the underlying claims, which we haven't talked

8    about yet, which gets around the partial professional services

9    exclusion in the D&O policy?

10       Again, the extrinsic evidence, if we're talking about *PG&E*

11   starts to add terms.  It's not explaining meaning to those

12   terms.  It's trying to add extra terms so we can add coverage

13   for some hypothetical conduct which no one has come forward and

14   said exists.  This is a reargument really of the *Food Pro* part.

15   That's why you asked them to allege facts which get around the

16   partial professional services exclusion and they didn't do

17   that.

18           **THE COURT:**  Okay.  Who else wants to -- go ahead.

19           **MR. DAVEGA:**  Thank you, your Honor.

20       First of all, we did offer some additional extrinsic

21   evidence beyond what was included in the first round.  For

22   example, and your Honor made reference to it, the E&O policy,

23   as you know, has a specific definition of "professional

24   services," which is not in the D&O and this was not pled in the

25   original complaint.

1    And that definition, I submit, is a much more

2  narrowly-tailored one than the one that your Honor used last

3  time by making reference to the case law, which was general and

4  broad.

5    And as my adversaries point out, they think the term "in

6  connection with" should be construed very, very broadly so that

7  once you have a professional service -- it seems as some once

8  ePlanning sold the securities, no matter what they did

9  thereafter is somehow tied to that and, therefore, embraced by

10 the exclusion.

11    Well, there's two reasons why that's not correct.  First

12 of all, there is a decision that's not been cited that Judge

13 Illston just recently rendered this past April which she talks

14 about the term "arising from," which you know from your opinion

15 that oftentimes is a substitute for "in connection with," or at

16 least it's been used that way in other exclusions.

17    In this decision what Judge Illston concludes is that

18 because of the general rule in California that exclusions are

19 to be construed narrowly and coverage clauses are to be

20 construed broadly, the precise term -- in her case it was

21 "arising from" or "arising out of" -- has a different

22 definition when it's looked at as part of an exclusion as

23 distinguished from part of a coverage clause.

24    And here is the problem that I have with their position.

25 As I understand their position, if Mr. Armitage from ePlanning

1  goes to Mr. Ambrosio's house and sells him the Newhall

2  investment, gets in his car, backs out and runs over

3  Mr. Ambrosio's son, it's not covered because that was in

4  connection with the sale of the securities in connection with

5  the professional service.

6       Now, the reason I think that that's --

7       **THE COURT:**  If you were contending somehow that there

8  is conduct of that kind, that is the sort of additional factual

9  averment that -- whether or not it's covered or not, I started

10 this process by saying:  What is the factual conduct here that

11 you say falls outside the exclusion?  And I get a lot of

12 theoretical discussion about what might or might not be

13 covered, but what isn't there is this is the conduct that

14 should be subject to coverage under the policy and is not

15 trumped by the exclusion, not theoretically what might be

16 covered or not covered.

17      **MR. DAVEGA:**  I understand what you're saying and I'm

18 going to go back now to what I believe is the factual component

19 of that that's contained in the Ambrosio complaint with the

20 proviso that your Honor heard some of this the first time

21 around, that --

22      **THE COURT:**  And that's right, and I admire the

23 zealous advocacy of reminding me of that.

24      But the fact of the matter is, right or wrong, I'm

25 familiar with the fact that there were averments about

```
 1  commingling, about ongoing management.  You can disagree with
 2  my conclusion on that, and certainly you're entitled to do so,
 3  but I you want you to know I'm aware of those.  So, you don't
 4  need to remind me of those.
 5          MR. DAVEGA:  No, but the reason that I believe that I
 6  do, your Honor, with all due respect is that they need -- they
 7  are to be viewed in a different context if we're looking at the
 8  term "in connection with" in a different context.
 9      And what my preface here was is that "in connection with"
10  has to be looked at much more narrowly than was done
11  originally.  And when you combine that with the E & O
12  definition of "professional services," it's a leap of faith, I
13  submit, to say that if the broker subsequently got involved in
14  the actual management of senior living homes, where is the
15  evidence that that's within his or her professional services?
16  It doesn't emerge from the definition?  It doesn't emerge from
17  their own answer in FINRA, which is also a new fact alleged in
18  my complaint where they said:  We're done with this thing the
19  moment we sell it.  We have nothing more to do with it.
20      Well, for whatever reason if they then go and get involved
21  in what constitutes the running of a senior living facility,
22  how is that within the scope of their professional services?
23          THE COURT:  Right.  And I appreciate that that is the
24  argument that you've made.  And I further appreciate that
25  you're saying you need to look through a different lense at
```

1   that conduct.

2          **MR. DAVEGA:**  Right.

3          **THE COURT:**  I understand that, but what is pretty

4   clear to me is that that is the conduct.  So when you're

5   talking about running somebody over as you're pulling out from

6   the Newhall property, that's an interesting theoretical

7   discussion we can have, but that's not conduct that you're

8   alleging needs to be covered here.

9          **MR. DAVEGA:**  No.  My only reason for using that

10  example is if you're going to use "in connection with" so

11  broadly to pick up everything without actually looking to the

12  specifics of whether or not the putting of a second loan on

13  those properties contrary to what's in the private memo, we

14  need to look at that and see whether or not is that a

15  professional service that ePlanning can be fairly considered to

16  be involved in?

17     I submit that it cannot be, for at a minimum it creates an

18  ambiguity that requires a further -- a development of the

19  facts.  That's my only point, your Honor, on that.

20          **MR. FOX:**  It's their facts, your Honor.  It's their

21  underlying complaints which form the basis of all of this.

22     And, again, what they keep going to is the professional

23  services part at the very end of the exclusion.  They are

24  ignoring the fact that the exclusion says:  There is no

25  coverage for any act, error, or omission in connection with

 1   those professional services.

 2       It's not just when you sell the securities that matters

 3   here with this exclusion.

 4           **THE COURT:**  Okay.

 5           **MR. DAVEGA:**  When does it end, I guess, would be my

 6   question in light of that?

 7           **THE COURT:**  Okay.

 8           **MR. LESSER:**  Your Honor, may I be heard on a couple

 9   of points?

10           **THE COURT:**  Go ahead.

11           **MR. LESSER:**  First of all, I need to weigh in on this

12   issue of the scope of the phrase "in connection with," but,

13   more importantly, I need to point out the language that we are

14   not here to construe.

15       I'm very concerned that we have throughout this case

16   spoken in terms of whether the excluded conduct arises out of

17   professional services.  That phrase which is the subject of

18   every case that Lloyd's has cited in support of its

19   interpretation appears nowhere --

20           **THE COURT:**  So you're disavowing your co-parties --

21           **MR. LESSER:**  Candidly I do.

22           **THE COURT:**  You're saying don't look at Judge

23   Illston's opinion --

24           **MR. LESSER:**  No, no, no.  I'm very happy with Judge

25   Illston's opinion.

1          THE COURT:  Apparently, it's interpreting "arising

2     under."

3          MR. LESSER:  But it is based on  -- it uses an

4     approach to analyzing an exclusion that I think is very

5     important for the Court to see and appreciate.

6          THE COURT:  Okay.

7          MR. LESSER:  But let me make this point.  The

8     exclusion we're talking about here is one of two types that

9     appears in the Lloyd's policy.

10         One type of exclusion is very broadly worded and says it

11    applies to anything that arises out of, relates to, in

12    consequence of and, by the way the phrase "directly" and

13    "indirectly" appears expressly in that form of exclusion.  But

14    we don't have that form of exclusion here.  We have a very much

15    narrower exclusion that excludes claims for certain types of

16    activity.  And we cited a case in our brief that explains the

17    narrowness of that format.

18         My point is, in -- and one of the reasons I urge the Court

19    to revisit its original analysis in this is that I think it's

20    very important when we're construing policy language to

21    construe the policy language that's actually in the policy, and

22    there is no use of this phrase "arising out of" in this policy.

23         THE COURT:  All right.

24         MR. LESSER:  So that's one point.

25    I wanted, your Honor, if I may very briefly, to respond to

1   the points made by Lloyd's counsel.

2       If you read Paragraphs 21 through 29 of our amended

3   complaint, that's where the alleged extrinsic evidence appears.

4   There is nothing in there that seeks to add any terms that

5   would be in violation of the parol evidence rule.  And it's

6   important to understand exactly how that works.

7       The parol evidence rule does not prohibit a Court from

8   finding additional terms via extrinsic evidence as long as

9   those additional terms or explanations of the circumstances of

10  their negotiation do not purport to vary or change the parties'

11  agreement.

12      Well, putting more detail on the elastic phrase "in

13  connection with" doesn't -- there's nothing following --

14          **THE COURT:**  It's all in the eye of the beholder.  Are

15  you adding or are you interpreting?

16      I mean, we go through that, that -- it's one of the most

17  elusive concepts.  The parol evidence rule is very -- as we all

18  know, it's --

19          **MR. LESSER:**  Sure.

20          **THE COURT:**  I'm familiar with what you're suggesting.

21          **MR. LESSER:**  Okay.  I don't think any of the -- and

22  none of the parol evidence we alleged would vary the terms of

23  the contract.

24      And I'd like to make just one point in closing and it goes

25  to the Court's question of whether your Honor should make this

1  decision as a matter of law.

2      Again, it's very important for us to recall that we are

3  not here to determine whether Lloyd's interpretation of this is

4  right or wrong.  My concern is we spent a lot of time arguing

5  about that.

6      The standard and the issue that's before the Court is

7  whether our proposed interpretation is, in the words of the

8  cases we cited, a wholly unreasonable or clearly erroneous

9  interpretation of the words themselves.  And we don't see how

10  construing "in connection with" to refer only to direct

11  relationships and not to indirect relationships can be seen --

12          **THE COURT:**  Right.  But one of my problems, to be

13  candid with you, is where I began this hearing; is that that

14  interpretation, language interpretation is not done in a

15  vacuum.  It's done against the factual averments that you

16  present.  And what you had presented in summary is the same

17  basic set of facts that you utilized at the beginning, which

18  is -- to characterize it in a general sense, the general

19  management and the commingling.

20      So it is not only as a theoretically analysis, as you

21  suggest; that if I think, putting all facts aside, the

22  interpretation one side has could well be a possible

23  interpretation, that's only part of the analysis.  It's also

24  then:  Okay, how does that pertain to the facts you allege?

25  And that's where I have some trouble because plaintiffs do seem

1  to suggest that I should just go off onto this theoretical

2  world and say:  Could there be coverage -- could this language

3  potentially cover this kind of conduct or this kind of conduct?

4      Well, that's beside the point.  What conduct do you claim

5  is covered?  And that's when I am -- well, I think you've more

6  or less acknowledged to me it rises or falls on this.  We say

7  the commingling and the ongoing management is outside of the

8  exclusion.

9          MR. LESSER:  Right, but what is new in our complaint

10  that wasn't there before is a different alleged

11  interpretation --

12          THE COURT:  That's just a legal conclusion.

13          MR. LESSER:  Well, your Honor --

14          THE COURT:  You're not carrying your obligation to

15  present a claim.  You have to present a claim and the claim has

16  to be more than a legal conclusion.

17      I understand your -- I'm not saying this -- I'm not saying

18  I've decided the question, but you keep arguing only the part

19  of your complaint that sets forth:  Well, this is the way to

20  interpret contract language.  This is our contract theory.

21  That's great.  But then you've got to then show me what is

22  your -- and, therefore, if I adopt your approach, these are the

23  facts that show we have a claim.

24      Let's use yours or your counterpart's example.  Backing

25  out from having sold a security and running somebody over.  If

1  that was the facts in your complaint, I'd have to analyze the

2  complaint, your theory and we, therefore, say this is a

3  plausible contract interpretation and if you adopt that, it

4  covers the risk -- the conduct we say occurred in this case.

5       So it's not an abstract -- it's not just if I buy your

6  theoretical contract interpretation language, therefore, you

7  may proceed, that's not correct.

8            **MR. LESSER:**  No.  I agree, your Honor.  I guess where

9  I disagree with the Court is the notion that allegations of an

10  interpretation of a contract are somehow theoretical.  We

11  allege specific extrinsic evidence.

12           **THE COURT:**  Right.

13           **MR. LESSER:**  We allege our interpretation of the

14  ambiguous provision, which is what you're supposed to do in a

15  contract --

16           **THE COURT:**  And then you've got to tell me and

17  because of that interpretation it covers this contract.

18  Because without that last part, you could pick any part of the

19  insurance agreement you want and say:  Oh, this is the

20  theory -- this is how we interpret this.  Well, that's nice,

21  but that has nothing to do with the claim.

22           **MR. LESSER:**  Fair enough, but then our amended

23  pleading goes on to allege that in light of the reasonable

24  interpretation of the exclusion that we allege, the D&O policy

25  does apply to the alleged acts and omissions that were not

1  centrally involved in rendering professional services; the

2  failure to stop the unlawful conduct, the post services

3  misrepresentations, activities by the holding company and

4  others not directly involved.  All of those are the facts, we

5  allege, in the underlying action that we say are covered not

6  because of the interpretation we alleged last time, but because

7  of the new interpretation.

8           **THE COURT:**  I understand.  I understand.  Okay.

9           **MR. LESSER:**  Thank you for your time, your Honor.

10          **THE COURT:**  The only other sort of process question

11  that I had at the end of the list that I had sent out to you is

12  in going forward -- I'll go back and make -- obviously, give

13  you my decision.  If to the extent the case is to proceed,

14  should it proceed on a consolidated basis or not?

15      What's the parties' view?

16          **MR. LESSER:**  Our view of that --

17          **THE COURT:**  The mechanics.

18          **MR. LESSER:**  (Continuing) -- is that it's probably

19  appropriate to consolidate for purposes of discovery.  I think

20  we are less sanguine about the notion of being able to

21  consolidate these various -- the various plaintiffs' cases for

22  purposes of trial because they are -- they do depend on very

23  different factual situations.

24          **MR. DAVEGA:**  I tend to agree with that in the sense

25  that, unfortunately, what we have with *AREI* and all these cases

1  stem from that.

2          **THE COURT:**  Right.

3          **MR. DAVEGA:**  Each of the particular plaintiffs here,

4  to varying degrees, involve different investments.  And so I

5  agree that when it comes time to trial, I don't think you will

6  be able to try them all together.

7      I do think for purposes of motion practice and a lot of

8  these things that are uniform and discovery, they definitely

9  ought to be consolidated.

10         **THE COURT:**  Okay.  Any other plaintiff view on that?

11         **MR. MILLER:**  Not on that, your Honor.

12         **MR. DEEDON:**  No, your Honor.

13         **THE COURT:**  Defense side?

14         **MR. FOX:**  The only thing I would point out is unless

15  it's some type of Court management issue, we seem to be doing

16  what they are suggesting already.  We're coordinating briefing

17  and we're having the hearings at the same time.

18      So I don't know that they are suggesting anything

19  different than what we're doing.

20         **THE COURT:**  So you're comfortable with the notion

21  that they can proceed together, whether one calls it -- putting

22  trial aside, whether or not you call it consolidation or what,

23  in terms of coordinating discovery and coordination of motion

24  practice --

25         **MR. FOX:**  Absolutely.

1              THE COURT:  (Continuing) -- you don't have any

2    problem with that.

3         Did you want to say something else?

4              MR.  MILLER:  No, your Honor.  That's fine.

5              THE COURT:  All right.  Thank you very much.  I will

6    take the matter under submission and give you an order.

7              MR. DAVEGA:  One thing that I didn't mention and I

8    wonder if I can.  I never really identified the Illston case to

9    the extent your Honor wants to look at it.

10        And the case is *Tower Insurance Company of New York versus*

11   *Capurro Enterprises, Inc.*  Unfortunately, the only cite I have

12   is a Lexis cite which is 2012 U.S. District Lexis 46443,

13   decided April 2, 2012.

14             THE COURT:  Okay.

15             MR. LESSER:  Your Honor, I have some copies here, if

16   the Court would like.

17             THE COURT:  Sure.  Although you're the party that

18   doesn't want me to consider her -- the language, the "arising

19   under."  You want the analysis, not the language being

20   construed.

21             (Document was tendered to the Court.)

22             THE COURT:  Okay.  Thank you.

23             (Proceedings adjourned.)

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____.

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, August 29, 2012