United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| WILLIAM AMBROSIO, *et al.*, | No. C 11-04956 RS |
| | No. C 11-04958 RS |
| Plaintiffs, | No. C 11-05760 RS |
| | No. C 11-05761 RS |
| v. | No. C 11-06366 RS |
| | No. C 11-06368 RS |
| CERTAIN UNDERWRITERS AT LLOYD'S UNDER POLICY NO. | **ORDER GRANTING MOTIONS TO DISMISS** |
| B0146LDUSA0701030 *and* DOES 1-100, *inclusive*, | |
| Defendants. | |
| _____/ | |
| AND RELATED ACTIONS | |
| _____/ | |

## I. INTRODUCTION

In these six related actions, plaintiffs assert breach of contract and associated claims against Brit UW Limited ("Brit," sued as "Certain Underwriters at Lloyd's…"),[1] for its failure to defend or settle plaintiffs' claims against an insured third party, ePlanning, Inc., and related entities.  Brit moved to dismiss plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), plaintiffs opposed the motions, and Brit filed a consolidated reply.[2]  Contending that Brit raised new arguments in that reply brief, plaintiffs in *Jamison* filed a further administrative motion, requesting leave to file a sur-reply, over Brit's opposition.  In consideration of the briefs, the arguments raised at the hearing, and for all the reasons set forth below, the motions must be granted with prejudice.

## II. BACKGROUND

---

[1] The parties occasionally refer to Lloyd's, rather than Brit, in their papers.  Lloyd's is a collective marketplace of underwriters, of which Brit is a member.  This order differentiates between Lloyd's and Brit where appropriate.

[2] The plaintiffs in *Ambrosio*, *Jamison*, and *Anderson* filed separate oppositions.  Plaintiffs in *Nowacki* and *Oakdale Heights* filed a joint opposition, and plaintiffs in *Roseville Capital* join the arguments asserted by the other plaintiffs but do not raise any separate contentions of their own.

The facts set forth in the plaintiffs' amended complaints, which must be accepted as true for purposes of these motions to dismiss, are as follows.[3] Plaintiffs are individual and institutional investors who purchased millions of dollars worth of debt securities from Asset Real Estate & Investment Co. ("AREI"), upon the recommendation of an entity called ePlanning. Specifically, plaintiffs aver that they proceeded with the transactions on the advice of ePlanning, Inc.'s subsidiaries, ePlanning Securities, Inc., and ePlanning Advisors, Inc. The AREI securities ePlanning recommended were corporate notes that conferred upon plaintiffs tenancy-in-common interests in various senior housing facilities ("the Newhall properties") managed by AREI. In exchange for brokering the transactions, the ePlanning entities allegedly received a commission.

As the prior order on Brit's first motion to dismiss related, ePlanning allegedly misrepresented the assets as carefully-vetted, safe investments that met plaintiffs' precise investment objectives and risk tolerances when, in fact, they were highly speculative, illiquid assets offered in connection with a massive Ponzi scheme operated by ePlanning, AREI, and the firms' principals. Plaintiffs in the *Ambrosio* action allege that ePlanning further misrepresented its involvement would be limited to brokering the sale of securities, and not the post-sale management of the investment properties underlying them. According to the *Ambrosio* plaintiffs, notwithstanding these promises, ePlanning's principals burdened the investment properties with an unauthorized second loan, diverted the proceeds of that loan and plaintiffs' capital contributions to other assets, failed to address unspecified "licensing issues," and neglected to maintain occupancy levels at the residential properties sufficient to sustain the properties' profitability. The *Anderson, Roseville Capital, Nowacki*, and *Oakdale Heights* plaintiffs allege that ePlanning also failed to establish internal administrative and operating procedures, including proper auditing, accounting, and record-keeping practices, that would have prevented or at least revealed the Ponzi scheme.

When the loans on the properties eventually went into default, and plaintiffs realized substantial losses, they brought claims against ePlanning in an arbitration filed before the Financial

---

[3] The prior order granted leave to amend for the limited purpose of permitting plaintiffs to develop their allegations that the ePlanning entities engaged in actionable conduct not falling within the Partial Professional Services Exclusion. As the following background makes clear, plaintiffs have amended their pleadings to pursue varying theories of liability.

United States District Court
For the Northern District of California

Industry Regulatory Authority ("FINRA") and initiated a number of related state actions, alleging state securities laws violations and other causes of action.[4] ePlanning retained counsel pursuant to a securities broker/dealer professional liability insurance policy ("the Errors & Omissions Policy or E&O policy") underwritten by various underwriters at Lloyd's. That policy covers the subsidiaries, ePlanning Securities, Inc., and ePlanning Advisors, Inc., but not the parent, ePlanning, Inc. Although the parties engaged in settlement talks, the E&O policy was eventually exhausted by other claims, and Lloyd's subsequently took the position that plaintiffs' claims were not covered by ePlanning's separate Directors, Officers and Company Liability Policy ("the D&O policy"). That policy insures parent ePlanning, Inc., as well as its subsidiaries. Ultimately, ePlanning and one of its principals, Jeffrey Guidi, assigned plaintiffs their potential claims against Lloyd's, and by extension Brit, for failure to defend or settle under the D&O policy, in exchange for plaintiffs' agreement not to advance claims against their other assets in the bankruptcy proceedings. Accordingly, in these six related actions, plaintiffs advance the theory that Brit is liable for failing to defend or settle their claims against ePlanning with the proceeds of the D&O policy.

The D&O policy[5] contains three insuring clauses:

A. Underwriters shall pay on behalf of the Directors and Officers Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for an Individual Act.
B. Underwriters shall pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any Claim first made against the Directors and Officers during the Policy Period for an Individual Act.
C. Underwriters shall pay on behalf of the Company Loss resulting from any Claim first made against the Company during the Policy Period for a Corporate Act.

D&O policy, at 8. It goes on to define "Individual Act," as it is used within the first insuring clause as:

> … any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by any of the Directors and Officers, while acting in their capacity as … a director or officer of the Company … or an employee of the Company but

---

[4] The *Ambrosio* plaintiffs' amended pleadings also allege that in the FINRA proceedings ePlanning argued – falsely, in plaintiffs' view – that it played no role in the management of assets.
[5] Per the prior order of dismissal, the policies are appropriate for consideration in connection with the instant motion.

only if the Claim is for an Employment Practice Violation or a Securities Law Violation.

*Id* at 7.  A "Corporate Act" similarly refers to "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the Company involving a Securities Law Violation."  *Id.* at 6.  "Securities Law Violation" is defined broadly to encompass violations of federal and state laws.  *Id.* at 7.  It also contains an integration clause stating, in part: "By acceptance of this Policy, the Assureds agree that this Policy embodies all agreements existing between them and Underwriters or any of their agents relating to this Insurance."  *Id.* at 18.

Defendant's prior motion to dismiss successfully argued that the D&O policy's "Partial Professional Services Exclusion" excluded coverage for ePlanning's sale of securities to plaintiffs. That provision states:

> Underwriters shall not be liable to make any payment in connection with any Claim … for any act, error or omission in connection with the performance of any professional services by or on behalf of the Company for the benefit of any other entity or person.

*Id.* at 8.  The order of dismissal, applying the foregoing language to the alleged facts, held: "A securities broker-dealer or financial advisor who receives a client's funds for the purpose of investment, and then commingles those funds, or mismanages the assets he or she recommends and subsequently acquires on the client's behalf, commits wrongs 'in connection with the performance of professional services.'"  Order at 13:15-18.  Plaintiffs were granted leave to amend, however, for the limited purpose of developing their allegations that ePlanning committed actionable conduct not "in connection with the performance of professional services," i.e., within the D&O policy's affirmative grant of coverage, but beyond the scope of the Partial Professional Services Exclusion. Plaintiffs in the six matters at issue here filed amended complaints and defendant once again moves to dismiss each of them for failure to state a claim.

Although the term "professional services" is not expressly defined in the D&O policy, it is defined in the E&O policy concurrently issued to the ePlanning subsidiaries:

> Professional Services means:
> (a) the following services, if rendered on behalf of a customer or client of the Broker/Dealer (including failure to supervise Registered Representatives)

United States District Court
For the Northern District of California

pursuant to a written agreement between the Broker/Dealer and the customer or client:

(i)  the purchase, sale or servicing of Securities approved by the Broker/Dealer …

(iv) providing economic advice, financial advice or investment advisory services, or

(v) providing financial planning advice including, without limitation, any of the following activities in conjunction therewith: the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, or planning for insurance, savings, investments, or retirement.

(b) services performed as a registered investment advisor, if rendered on behalf of a customer or client of the Registered Investment Advisor (including failure to supervise Registered Representatives) pursuant to a signed and dated written investment advisory or investment management contract stating the scope of such services and the compensation to be paid therefor.

E&O policy at EP 26.[6]

## III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleadings are "so construed as to do substantial justice." Fed. R. Civ. P. 8(f). A complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) based on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). When dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

---

[6] Plaintiffs' amended complaint alleges the contents of the E&O policy, and it is attached to a declaration in support of their opposition brief. As neither party disputes the authenticity of the document, it is appropriate for consideration at this stage of the proceedings. *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds).

ORDER GRANTING MOTIONS TO DISMISS
NO. C 11-04956
AND RELATED ACTIONS

IV. DISCUSSION

A. *Ambrosio*

In the *Ambrosio* action, plaintiffs assert that the definition of "professional services" does not embrace ePlanning's alleged asset management activities, as indicated by their amended factual allegations, ePlanning's own representations in the FINRA proceedings, and the definition of "professional services" set forth in the E&O policy. Alternatively, plaintiffs characterize the relevant conduct as implicating "business decisions" rather than "professional services." Brit argues that the amended *Ambrosio* complaint simply reasserts allegations already found to be deficient, and therefore must be dismissed, this time without leave to amend.

As for the amended factual allegations, plaintiffs advance a somewhat inconsistent account of the facts. Previously, plaintiffs asserted that ePlanning and/or Guidi committed wrongs not implicated by the Partial Professional Services Exclusion by, among other things, burdening the Newhall properties with an unauthorized loan and "improperly commingling the contributions by Newhall investors with those of investors in other ventures sponsored and syndicated by AREI and ePlanning." *See* Pls.' Opp'n at 21:9-11 (Dkt. No. 29). From this allegation, the prior order inferred that ePlanning must have received funds from plaintiffs, and mismanaged both the money and assets acquired – conduct that was found to fall within the scope of the exclusion. Not so, plaintiffs now argue. Responding to the prior order of dismissal, plaintiffs insist that ePlanning acted solely as the selling broker and "never received or held the funds of the *Ambrosio* plaintiffs for the purchase of the Newhall securities." Pls.' Opp'n at 6:4-5 (Dkt. No. 49). Instead, they allege, "AREI's affiliate, Newhall Capital, received those funds *directly* from the plaintiffs." *Id.* at 6:5-6 (emphasis in original). It is difficult to conceive how the ePlanning entities or Guidi could have misdirected plaintiffs' capital contributions away from the Newhall properties if they "never received or held the funds," as plaintiffs claim. More broadly, the pleadings shed little light on how ePlanning supposedly exercised unauthorized control over properties managed and held by AREI.[7]

---

[7] The *Anderson* plaintiffs concede that the individual principals of ePlanning also controlled AREI, but insist, without factual support, that their post-sale management activities were conducted under the auspices of ePlanning, rather than AREI. As Brit points out, if they were actually acting under AREI's authority, no coverage obtains because it is not an insured.

Brit, for its part, insists any post-sale misconduct was actually committed by AREI, or perhaps by Guidi on behalf of AREI. Were that the case, there would be no basis for liability based on the D&O policy, as AREI is not insured under it. Along the same lines, Brit maintains that plaintiffs' FINRA and state court claims against the ePlanning entities and its representatives were premised solely upon a failure to disclose, and that plaintiffs asserted AREI committed the misconduct at issue here. Plaintiffs, on the other hand, insist all of their representations have been consistent. They further emphasize that the ePlanning entities argued in the FINRA proceedings that it played no role in post-sale management of the Newhall properties. Although they maintain that representation was inaccurate, they also argue that it supports their position the alleged misconduct was unrelated to any professional services ePlanning performed. None of these contentions are persuasive. For present purposes, of course, plaintiffs' allegations must be accepted as true, and for that reason, Brit's position that AREI was responsible for the alleged misconduct must be rejected. At the same time, positions the ePlanning entities adopted in later litigation have no direct relevance to the underlying events, and ultimately, plaintiffs cannot proceed on their theory that ePlanning somehow usurped AREI given the evident inconsistencies in their account of events. Their contention that the ePlanning entities mismanaged assets delivered "directly" to AREI is without explanation, makes no sense on its own, and appears to be simply a gambit to escape dismissal. Such implausible allegations need not be countenanced. *Iqbal*, 129 S. Ct. at 1949.

Furthermore, to the extent plaintiffs invoke the E&O policy's definition of "professional services," that does not alter the foregoing conclusion. Even assuming the E&O policy is properly considered as extrinsic evidence of the D&O policy's meaning, and accepting plaintiffs' relatively delimited understanding of "professional services" derived therefrom, the question is not simply whether the ePlanning entities' alleged conduct qualifies as "offering and selling financial products," or "rendering financial advice," as plaintiffs seem to think. Rather, as the prior order of dismissal explained, the issue is whether the alleged conduct occurred "in connection with" those services. The *Ambrosio* plaintiffs do not contend with that attenuating phrase, and instead stake their claims on the mistaken premise that only professional services, very narrowly defined, are excluded from coverage under the D&O policy. Even assuming ePlanning was responsible for the

1  post-sale management activities, the complaint does not support the inference that such conduct

2  occurred without connection to the professional services the ePlanning entities indisputably

3  provided plaintiffs.

4          In a final, alternative attempt to escape the sweep of the exclusion, the *Ambrosio* plaintiffs

5  characterize ePlanning's alleged conduct as implicating "business decisions," rather than

6  "professional services."  In service of this argument, they analogize to *Massamont Insurance*

7  *Agency, Inc. v. Utica Mutual Life Insurance Company*, 448 F. Supp. 2d 329, 331-32 (D. Mass.

8  2006).  In that action, the District Court held that an insured agency's decision to transfer business

9  to another firm, in violation of an exclusivity provision in its contract, did not constitute a

10 "professional service," or in other words, "any specialized knowledge or skill," but "rather was

11 simply a business decision."  *Id.* at 332.  As the court noted, the contractual language at issue

12 provided that for liability to lodge, "[t]he 'loss' must arise out of 'wrongful acts' committed in the

13 conduct of [the insured's] business[,] ... by [the insured,] ... *in rendering or failing to render*

14 *professional services*."  *Id.* at 331 (emphasis added).

15         Here, again, by contrast, the exclusion applies more broadly to "any act, error or omission *in*

16 *connection with* the performance of any professional services" (emphasis added).  Even assuming

17 plaintiffs are correct to characterize ePlanning's conduct as reflecting "business decisions" that

18 cannot be equated with "professional services," nothing forecloses "business decisions" from being

19 undertaken "in connection with the performance of any professional services."  While, as a general

20 matter, California law requires the affirmative grant of coverage under an insurance policy to be

21 broadly construed, and exclusions narrowly, in order to protect the expectations of the insured, that

22 principle cannot be employed to rewrite the policy to the satisfaction of one party or the other.  *PMI*

23 *Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 765 (9th Cir. 2005).  Because the

24 *Ambrosio* plaintiffs misread the exclusion to apply solely to "professional services," their argument

25 that "business decisions" are not excluded from coverage misses the mark.  The complaint must be

26 dismissed.

27 B. *Jamison*

28         1. Motion for leave to file

As an initial matter, plaintiffs in *Jamison* request leave to file a sur-reply, pursuant to Civil Local Rule 7-11, on the premise Brit has impermissibly disclosed the basis for its motion for the first time in its reply brief.  Specifically, they argue that Brit failed to address the parol evidence identified in the amended complaint and its impact upon the sufficiency of the pleadings in its original moving papers.  Generally, of course, arguments may not be raised by the moving party in its reply papers, because doing so deprives the non-moving party of an opportunity to respond. *Lentini v. Cal. Cntr. for the Arts, Escondido*, 370 F.3d 837, 843 n.6 (9th Cir. 2004).  Here, plaintiffs are correct Brit failed to address expressly the relevance of parol evidence in its moving papers, and instead, generally argued plaintiffs' allegations are conclusory, and lack sufficient factual detail.  Brit's general attack on the sufficiency of the pleadings may be construed as directed to the alleged extrinsic evidence, however, and plaintiffs apparently so understood it, as they chose to brief the issue extensively in their opposition papers.  As a consequence, this is hardly an instance in which the non-moving party was denied an opportunity to address the relevant issues.  Nonetheless, because plaintiffs have not had a full opportunity to *respond* to the arguments raised by Brit in its reply, plaintiffs' motion for leave to file a sur-reply will be granted.[8]

### 2. Motion to dismiss

In *Jamison*, the pleadings advance a novel construction of the D&O policy and the Partial Professional Services Exclusion, on the basis of the policy's language and alleged extrinsic evidence concerning the parties' negotiations and expectations as well as the ePlanning entities' corporate structure and operations.  As for the ePlanning subsidiaries, the *Jamison* plaintiffs allege that the exclusion is "partial" in the sense that coverage under the D&O policy was excluded for professional services the ePlanning subsidiaries actually provided to clients, and for which there was coverage under the E&O policy, but not excluded for conduct connected "indirectly" to the provision of professional services.  With respect to the parent, ePlanning, Inc., which is not insured under the E&O policy, plaintiffs assert the D&O policy's exclusionary clause again bars coverage

---

[8] The sur-reply plaintiffs propose to submit is attached to the administrative motion requesting leave, and is hereby deemed filed.  To the extent Brit correctly points out that the sur-reply repeats some arguments already contained in plaintiffs' opposition brief, those matters are disregarded.

for professional services actually rendered by the parent, but *not* for secondary forms of liability arising out of the subsidiaries' conduct, such as supervisory liability.

Under California law, which indisputably governs interpretation of the D&O policy, "[i]nsurance policies are contracts and therefore subject to the rules of construction governing contracts." *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 762-63 (2001) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). Questions of interpretation may be suitable for resolution as a matter of law on a motion to dismiss. *Valencia v. Smyth*, 185 Cal. App. 4th 153, 161-62 (2010). Insurance policies, like contracts in general, are construed to honor the "mutual intention" of the parties at the time the policy was issued, based "solely from the written provisions of the contract." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003) (citing Cal. Civ. Code §§ 1636, 1639). Thus, under general principles of contract interpretation, if a given term is "clear and explicit," then its "ordinary and popular sense" governs, unless plaintiff asserts some other meaning was intended. *Mackinnon*, 31 Cal. 4th at 647-648; *Bank of the West*, 2 Cal. 4th at 1264.

In the latter case, under California's much-criticized parol evidence rule, plaintiffs must be afforded an opportunity to present evidence extrinsic to the four corners of the agreement, provided it is deemed relevant to proving an interpretation to which the contract is "reasonably susceptible." *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 40-41 (1968) ("*PG&E*"). *See also Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005 (9th Cir. 2012) ("A party's assertion of ambiguity does not require the district court to allow additional opportunities to find or present extrinsic evidence if the court considers the contract language and the evidence … and concludes that the language is reasonably susceptible to only one interpretation."). In other words, to prevail on the pleadings based on the terms of the policy alone, an insurer "must establish conclusively that [the policy's] language unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint." *Palacin v. Allstate Ins. Co.*, 119 Cal. App. 4th 855, 862 (2004) (citing *Columbia Cas. Co. v. Northwestern Nat. Ins. Co.*, 231 Cal. App. 3d 457, 468-73 (1991)); *Aargon-Haas v. Family Security Ins. Servs., Inc.*, 231 Cal. App. 3d 232, 239 (1991) (extrinsic evidence must be considered "as long as the complaint does not place a clearly erroneous construction on the provisions of the contract"). "To meet this burden, an insurer is required to

United States District Court
For the Northern District of California

1   demonstrate that the policy language supporting its position is so clear that parol evidence would be

2   inadmissible to refute it." *Palacin*, 119 Cal. App. 4th at 862 (citing *Columbia Cas. Co.*, 231 Cal.

3   App. 3d at 469). Otherwise, the court must "permit the parties to litigate the issue in a context that

4   permits the development and presentation of a factual record, e.g., summary judgment or trial." *Id.*

5   Although Brit emphasizes that the D&O policy (like the E&O policy) is fully integrated, that

6   does not necessarily bar consideration of parol evidence used to elucidate "the circumstances under

7   which the agreement was made or to which it relates, or to explain an extrinsic ambiguity or

8   otherwise interpret the terms of the agreement." Cal. Code Civ. P. § 1856(g). Rather, "[w]here

9   parties to a written contract have agreed to it as an 'integration,' i.e., a complete and final

10   embodiment of the terms of an agreement, parol evidence cannot be used to *add to or vary* its

11   terms." *Aargon-Haas*, 231 Cal. App. 3d at 240 (emphasis added). Parol evidence is nonetheless

12   admissible, in this context, "to explain what the parties meant by the language they used." *Id.*

13   Turning to the particular interpretation at issue here, with respect to the parent company,

14   ePlanning, Inc., the *Jamison* plaintiffs understand the exclusion to be "partial" in the sense that it

15   bars coverage for primary liability for the performance of professional services, but not for

16   secondary liability incurred by virtue of the subsidiaries' actions. They purport to derive intrinsic

17   support for their position from the clause's applicability to claims "*for* any act, error, or omission *in*

18   *connection with* the performance of any professional services by or on behalf of the Company"

19   (emphasis added). By contrast, they note, other exclusions in the policy apply, apparently more

20   broadly, to claims "based upon, arising out of, directly or indirectly from[,] or in consequence of, or

21   in any way involving" the excluded conduct. D&O policy at 8.

22   The extrinsic evidence plaintiffs invoke consists of the general, alleged expectations of the

23   parties to the agreement. They also allege that ePlanning, Inc. did not itself provide professional

24   services to clients, and for that very reason, was not an insured under the E&O policy. Plaintiffs

25   therefore reason that if the D&O policy is interpreted not to provide coverage for secondary liability,

26   then ePlanning, Inc. would possess no insurance coverage whatsoever for securities violations –

27   arguably, a disfavored result. *See, e.g., Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 762-63

28   (2001) (interpretations of exclusions that render coverage illusory, null, or meaningless, are

ORDER GRANTING MOTIONS TO DISMISS
No. C 11-04956
AND RELATED ACTIONS

**United States District Court**
For the Northern District of California

disfavored).  Plaintiffs also assert the parent company was thinly capitalized, spent a significant portion of its funds paying the policy premiums, and was unlikely to face liability claims other than those arising secondarily, by virtue of its subsidiaries' conduct.  Plaintiffs insist these allegations, taken together, support its interpretation of the Partial Professional Services Exclusion and therefore must be considered on a full factual record before adjudication of the contract's proper scope.

Brit counters that plaintiffs' interpretation ignores the sweep of the key phrase "in connection with."  The prior order addressed plaintiffs' original complaints, and therefore did not take in account the alleged extrinsic evidence, or the parties' full briefing of the issue.  *See* Order at 12:10-12 ("Here, although the D&O policy actually uses the phrase 'in connection with,' rather than 'arising out of,' the phrases appear synonymous and neither party has suggested any identifiable difference.").  It determined only that the relevant exclusionary language "sweeps more broadly than plaintiffs are willing to acknowledge, and their suggestion that ePlanning's alleged misconduct is *entirely unrelated*, in the end, is simply not tenable."  *Id.* at 13:12-14 (emphasis added).  The order cannot be fairly read to foreclose the *Jamison* plaintiffs' present position that ePlanning's conduct was indirectly connected to the performance of professional services, and thus not implicated by the exclusion.

Plaintiffs argue that because the exclusion applies only to liability for professional services rendered "*by or on behalf of* the Company" (emphasis added), coverage for the parent's potential secondary liability is not excluded.  The policy, however, defines "the Company" as including "the Parent Company" and "any Subsidiary."  *See* D&O policy at 5.  Brit therefore argues that even coverage for the parent's potential secondary liability must be excluded.  While that counterargument certainly has some force, it does not so conclusively negate plaintiffs' urged interpretation as to preclude the presentation of extrinsic evidence, and thereby to end the inquiry.  *Palacin*, 119 Cal. App. 4th at 862.

Notably, based on the very same policy language, plaintiffs advance different contentions in relation to the ePlanning subsidiaries.  Specifically, they argue that coverage under the D&O policy was excluded for primary liability for professional services provided directly to clients.  For intrinsic support, they again invoke the exclusion's prefatory language, "for any act…," which they read

narrowly, as described above.  Turning to extrinsic evidence, plaintiffs note that the subsidiaries' primary liability for securities violations was covered under the E&O policy, obviating the need for duplicative coverage under the D&O policy.  To the extent the phrase "in connection with" is ambiguous as to the kind of connection required, plaintiffs again submit the alleged extrinsic evidence must be considered, or at the very least, that it must be narrowly construed as excluding only conduct directly connected to the performance of professional services.  *See PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 765 (9th Cir. 2005) ("California law instructs that such interpretive quandaries [concerning ambiguities] be resolved in favor of the insured and against the insurer").  Thus, according to plaintiffs, "[l]iability that bears only an indirect connection to the insureds' sales of securities or investment advice, such as their alleged concealment and failure to disclose the Ponzi scheme and other wrongdoing *after* Plaintiffs invested and acted on the insureds' advice, is not excluded."  *Jamison* Pls.' Opp'n at 12:13-16 (emphasis in original).

Brit insists that the exclusion is not reasonably susceptible to the interpretation urged by plaintiffs, and maintains that the alleged intrinsic evidence should be disregarded as a result.[9]  It generally argues that the prior order of dismissal already found the exclusion to be plain, clear and unambiguous.  To the extent that is true, again, the prior pleadings did not present the issues now before the court.  Perhaps more to the point, whatever the ultimate wisdom of *PG&E*, at least on this point, it clearly instructs: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  69 Cal. 2d at 37.  That said, plaintiffs' interpretation of the exclusionary language is, unquestionably, strained to the breaking point.  Significantly, they insist that a single, relatively simple phrase, "in connection with," has divergent meanings with respect to different insureds, and all according to an elaborate structure that is nowhere else reflected in the terms of the policy.  Furthermore, while plaintiff's theory of secondary liability, as it applies to ePlanning, Inc.,

---

[9] While doubting plaintiffs could adduce any extrinsic evidence to support their position, defendant's approach to deciding the instant motion is plainly foreclosed by *PG&E*, absent a finding that the contract is not "reasonably susceptible" to the reading plaintiffs adopt.  69 Cal. 2d at 40-41.

is relatively clear and cognizable, it is not at all apparent from the pleadings what distinguishes a "direct" from an "indirect" connection, with respect to the subsidiaries' performance of professional services.

That observation leads to the next point: even putting that defect aside, the question remains whether the pleadings sufficiently allege, as a factual matter, conduct falling beyond the scope of the exclusion. As Brit emphasizes, the amended complaint is long on legal argument and short on facts. Indeed, it does not assert any new facts in response to this Court's prior order of dismissal. Instead, it simply advances a novel interpretation of the policy language, and generally asserts the subsidiaries' liability arises from "the formation and ongoing operation of a Ponzi scheme using Plaintiffs' funds, and the insureds' failure to disclose their ongoing fraudulent conduct and conversion of the Plaintiffs' money." First Am. Compl. ¶ 29. That alleged conduct cannot plausibly be understood to be "indirectly" connected to the promotion of the very securities used to perpetrate the Ponzi scheme. Alternatively, the amended complaint alleges that liability may be predicated on the failure of ePlanning Securities' officers and directors to "ensure the companies' legal compliance and maintenance of accurate and lawful books and records, and their operation of the companies in a manner that allowed, if not supported, the creation and maintenance of the alleged Ponzi scheme." *Id.* Finally, the complaint also suggests that ePlanning's supposed unauthorized mismanagement of assets may qualify. *Id.* These are familiar, but ultimately unpersuasive, allegations, which were addressed in the prior order of dismissal. The factual allegations directed to establishing the parent's liability are similarly sparse and conclusory. In fact, there are no specific, discrete factual allegations to show how ePlanning failed to supervise its subsidiaries.

Given the posture of this case, the absence of any new factual allegations that would support a plausible claim is telling. The *Jamison* plaintiffs used the opportunity for amendment essentially to advance once more their original reading of the policy, and in so doing failed yet again to show how their legal contentions apply to ePlanning's conduct. Even resolving all inferences in favor of plaintiffs, as is required under Rule 12(b)(6), there is no discernible conduct that occurred in "indirect" relation to the ePlanning entities performance of professional services. The *Jamison*

1  complaint must therefore be dismissed without leave to amend, as it is apparent plaintiffs do not

2  have a sufficient factual basis for their claims.

3  C. *Anderson*, *Roseville Capital*, *Nowacki*, and *Oakland Heights*

4         Plaintiffs in the remaining actions advance parallel factual allegations, the substance of

5  which is that the ePlanning entities failed to implement general internal administrative and operating

6  procedures, including, in particular, proper auditing, accounting, and record-keeping practices, that

7  would have prevented or revealed the Ponzi scheme.  As the prior order of dismissal recognized,

8  "certain routine administrative and business practices that do not engage the specialized knowledge

9  and skills denoted as 'professional,' such as billing and fee-setting activities, do not fall within the

10  meaning of [professional services]."  Order, at 12.  Under that rubric, the remaining plaintiffs seek

11  to fit their claims.[10]  There is a significant difference, however, between ordinary office activities

12  that are common to a wide variety of businesses, and quality- and risk-control procedures designed

13  to safeguard the provision of professional services in the financial industry.  Plaintiffs' authorities

14  are therefore inapposite.  *See, e.g., Inglewood Radiology Med. Grp., Inc. v. Hospital Shared Servs.,

15  Inc.*, 217 Cal. App. 3d 1366, 1369-71 (1989) (physician's decision to terminate employee not a

16  professional service even if determination implicated use of professional knowledge); *Blumberg v.

17  Guarantee Ins. Co.*, 192 Cal. App. 3d 1286, 1292-93 (1987) (lawsuit between attorneys concerning

18  alleged breach of partnership agreement did not implicate provision of professional services).

19  Auditing, accounting, and record-keeping of investment activities, moreover, arguably fall within

20  the meaning ascribed to "professional service" by the case law.  *Tradewinds Escrow, Inc. v. Truck

21  Ins. Exch.,* 97 Cal. App. 4th 704, 713 (2002) ("professional service" is one "arising out of a

22  vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and

---

[10] The *Anderson* plaintiffs, like the *Amrbosio* litigants, contend that ePlanning's alleged post-sale management activities are not "professional services."  As noted, however, that argument fails to contend with the prepositional phrase, "in connection with."  The *Anderson* plaintiffs maintain that "ePlanning and AREI were intextricably entwined with each other and ePlanning, which was the funding arm of all of the AREI related activities, engaged in business decisions which included diverting funds to the AREI sponsored real estate ventures and using those funds from later investors to pay interest to earlier investors."  Pls.' Opp'n at 12.  In the end, it is simply untenable to suggest that such conduct has no connection with the provision of professional services, when in fact all of the alleged activities were directed to advancing an apparent Ponzi scheme founded upon the sale of misrepresented securities.

ORDER GRANTING MOTIONS TO DISMISS
No. C 11-04956
AND RELATED ACTIONS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the labor or skill involved is predominantly mental or intellectual, rather than physical or manual"). Finally, even were that somehow not so, again, the Partial Professional Services Exclusion applies to conduct undertaken "in connection with" the provision of professional services. Plaintiffs' own theory of liability supplies the connection here: had ePlanning undertaken auditing and accounting and implemented other controls, it would have prevented or at least revealed the Ponzi scheme, and related securities violations. Plaintiffs' insistence there is no connection is simply implausible. Accordingly, alleging the ePlanning entities failed to utilize proper auditing, accounting, and record-keeping practices cannot support a claim for relief.

Alternatively, the *Anderson* plaintiffs alone argue the D&O policy is inherently ambiguous for a variety of reasons. Specifically, they maintain it cannot be determined whether "professional services" are meant to include "Individual Act[s]," as defined in the policy, or not. In support of their position, they analogize to *Corky McMillin Const. Servs., Inc. v. U.S. Specialty Ins. Co.*, No. C 11-01686, 2012 WL 92346 at *2 (S.D. Cal. Jan. 11, 2012), in which the District Court recognized an inherent ambiguity in the language of the errors and omissions policy at issue. In particular, the Court could not determine whether a policy exclusion for "services," which the Court "broadly defined to include helping or doing work for someone," encompassed "Wrongful Act[s]," i.e., an "actual or alleged act, error, misstatement, misleading statement, omission or breach of duty," which the policy purportedly covered. *Id.* Unfortunately, the concise opinion in *Corky McMillin* does little to elucidate the parameters of the Court's uncertainty.

While the *Anderson* plaintiffs leave their argument largely undeveloped, it appears to be that it cannot be determined whether or not the professional services exclusion implicates coverage for "Individual Act[s]," defined as "any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by any of the Directors and Officers, while acting in their capacity as … a director or officer of the Company … or an employee of the Company but only if the Claim is for an Employment Practice Violation or a Securities Law Violation." D&O policy at 8. Without the benefit of further explication of the supposed ambiguity by plaintiffs, no uncertainty is apparent. Given the plain language of the policy, the exclusion applies to some, though not all, "Individual Act[s]." That conclusion ends the inquiry.

ORDER GRANTING MOTIONS TO DISMISS
NO. C 11-04956
AND RELATED ACTIONS

The *Anderson* plaintiffs' further arguments are unavailing and do not warrant denial of the motion.  First, insofar as they contend the Partial Professional Services exclusion is not sufficiently conspicuous in the policy, that argument goes nowhere.  While it is true the exclusion is set forth towards the end of the policy, and apart from some of the other exclusionary clauses, it appears in capital letters.  Certainly it cannot be said, as a matter of law, that no reasonable person would notice it.  *Ponder v. Blue Cross of So. Cal.*, 145 Cal. App. 3d 709, 722-723 (1983); *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 922-23 (2009).  Finally, plaintiffs argue the term "Partial" is ambiguous.  That position was discussed, and ultimately rejected, in the prior order of dismissal, and need not be revisited here.

### V. CONCLUSION

For the reasons stated, the motions to dismiss must be granted with prejudice.


IT IS SO ORDERED.


Dated: 9/28/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California